STEPHEN EAMIELLO ET AL. *v.* LIBERTY MOBILE HOME SALES, INC.
(13310)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued May 4—decision released August 16, 1988

*Robert L. Hirtle, Jr.,* for the appellant (defendant).

*Edward G. Fitzpatrick,* with whom, on the brief, was *Peter E. Mariano,* for the appellees (plaintiffs).

*Joseph I. Lieberman,* attorney general, and *Robert M. Langer, William M. Rubenstein* and *Stephen R. Park,* assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

SHEA, J. In this action the plaintiffs, Stephen Eamiello and his wife, Rita Eamiello, owners of a mobile home, sought injunctive relief and monetary damages against the defendant, Liberty Mobile Home Sales, Inc., which owns the lot where the home is located. The plaintiffs alleged in their amended complaint that the parties' rental agreement in regard to this lot illegally pre-

vented the plaintiffs from selling the home while it remained on the defendant's lot. The trial court rendered judgment for the plaintiffs to recover compensatory damages, punitive damages, costs and attorney's fees on the count of the complaint alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. It also issued a permanent injunction prohibiting the defendant from interfering with the on-site sale of the plaintiffs' mobile home and ordering the defendant to restore running water to the home upon the condition that the plaintiffs resume paying monthly use and occupancy fees to the defendant ten days after their water service has been restored. In addition, it rendered judgment for the plaintiffs on the counterclaim for failure to pay rent to the defendant from December 1, 1984, through the date of judgment, August 31, 1987, on the ground that the plaintiffs' home became untenantable because the defendant had turned off the water supply during this period and the defendant's action in this regard excused the plaintiffs from paying rent or use and occupancy fees pursuant to General Statutes § 47a-4a.[1]

---

[1] General Statutes § 47a-4a provides: "EFFECT OF FAILURE TO COMPLY WITH SECTION 47A-7. A rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7."

General Statutes § 47a-7 (a) provides: "LANDLORD'S RESPONSIBILITIES. (a) A landlord shall: (1) Comply with the requirements of chapter 368o and all applicable building and housing codes materially affecting health and safety of both the state or any political subdivision thereof; (2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition, except where the premises are intentionally rendered unfit or uninhabitable by the tenant, a member of his family or other person on the premises with his consent, in which case such duty shall be the responsibility of the tenant; (3) keep all common areas of the premises in a clean and safe condition; (4) maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances and elevators, supplied or required to be supplied by him; (5) provide and maintain appropriate receptacles for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit and arrange for their removal; and (6) supply running water and reasonable amounts of hot water at all times and reasonable heat except if the building which includes the dwelling unit is not

In its appeal from the judgment, the defendant claims that the trial court erred in concluding that: (1) the parties' rental agreement imposed resale conditions that were not permitted by General Statutes § 21-79;[2]

required by law to be equipped for that purpose or if the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection."

[2] "[General Statutes] Sec. 21-79. OWNER PROHIBITED FROM RESTRICTING RESIDENT'S RIGHT TO SELL. (a) No owner or operator of a mobile manufactured home park shall require a resident who owns a mobile manufactured home which is safe, sanitary and in conformance with aesthetic standards to remove the home from the development at the time such mobile manufactured home is sold or a mortgage on such a home is foreclosed provided that the purchaser or foreclosing mortgagee shall assume and be bound by the rental agreement of the foreclosed mortgagor and shall be bound by the rules and regulations of the park.

"(b) A mobile manufactured home shall be presumed to be safe and sanitary if it is established that the mobile manufactured home was constructed in accordance with any nationally recognized building or construction code or standard. Failure to meet any such standard or the provisions of any such code shall not automatically raise a presumption that the mobile manufactured home is unsafe or unsanitary. Such failure shall not be used as a reason for withholding approval of an on-site sale unless such failure renders the mobile manufactured home unsafe or unsanitary.

"(c) The owner of a mobile manufactured home park shall bear the burden of showing that a mobile manufactured home is unsafe, unsanitary, or fails to meet the aesthetic standards of the development. No aesthetic standard concerning those physical characteristics such as size, original color or original building materials, which cannot be changed without undue financial hardship to the resident, shall be applied against a mobile home.

"(d) Any purchaser of a mobile manufactured home sold by a resident may become a resident of the mobile manufactured home park provided he meets the entry requirements for said park and such requirements are equally applied by the owner to all purchasers and prospective residents and the owner approves such entry. Such approval may not be withheld except for good cause. For the purposes of this section good cause means a reasonable cause for the owner to believe (1) that such purchaser intends to utilize the purchased mobile manufactured home for an illegal or immoral purpose or for any purpose that would disturb the quiet enjoyment of the other residents of the park or (2) that the purchaser is or will be financially unable to pay the rent for the space or lot upon which the purchased mobile manufactured home is located. If the owner denies approval to a purchaser, he shall, in writing, state any reason for such disapproval. Such statement shall be delivered to the resident and the purchaser or prospective resi-

(2) General Statutes (Rev. to 1985) § 21-70 (c)[3] gave the department of consumer protection authority to approve resale standards in regard to mobile homes, other than aesthetic standards; (3) the plaintiffs had satisfied the requirements of the supplemental judgment in an unreported action the defendant had

dent within ten days after the owner receives the completed application of the purchaser or prospective resident. Failure to deliver such notification within ten days shall be deemed to be approval.

"(e) Any resident wishing to sell his or her home shall request a written statement of the owner's intentions regarding the condition of the home. Within twenty days after receipt of such a request, the owner shall approve the home's condition for resale or deliver a written statement to the resident specifying the reasons why the home is not safe, sanitary, or in conformance with aesthetic standards. Failure of the owner to respond within twenty days shall be deemed to be an approval of the home's condition for resale. If the resident disputes the owner's response, he may seek a declaratory ruling from the department of consumer protection. The resident may attempt to correct defects identified by the owner and may again request the owner's approval of the home's condition for resale. If the resident again disputes the owner's response, he may once again seek a declaratory ruling from the department. An owner's statement of approval shall remain in force for not more than six months. No owner shall exact a commission or fee with respect to the price realized by the seller, unless he has acted as agent for the seller in a sale pursuant to a written contract, or charge a rent for the mobile manufactured home space or lot upon which the purchased mobile manufactured home is located greater than the prevailing rent for any other space or lot located in the park."

[3] General Statutes (Rev. to 1985) § 21-70 (c) provides: "Owners shall submit to the department of consumer protection any proposed change in the terms or provisions, other than rent, of standard written rental agreements, the aesthetic standards to be complied with by the owner and resident in the event of the sale of the mobile manufactured home by the resident, or rules or regulations concerning the resident's use and occupancy of the premises. No change in the terms or provisions, other than rent, of the written rental agreements, aesthetic standards, or rules or regulations shall be effective until the department of consumer protection reviews, approves and files the changes to insure compliance with the provisions of this chapter. Within sixty days after October 1, 1983, all lease provisions, rules or regulations and aesthetic standards in effect shall be submitted to the department of consumer protection for review, approval and filing. Pending review, all lease provisions, rules and aesthetic standards shall be effective and enforceable to the extent that they are in conformance with the provisions of this chapter."

brought against the town of Prospect; (4) General Statutes § 21-68a[4] is not an unconstitutional delegation of legislative authority when it permits a local building inspector to determine whether a mobile home is safe and sanitary, but does not provide any measuring standards; (5) § 21-79 (a) is constitutional despite the claim that it amounts to an unjustified taking of property;[5] (6) § 47a-4a applies to an owner of a mobile home located in a mobile home park and precludes recovery on the counterclaim for rent from December 1, 1984; (7) a permanent injunction should be issued prohibiting the defendant from enforcing the resale standards in the parties' lease in order to prevent the on-site sale of the plaintiffs' mobile home; (8) the defendant's attempt to enforce the resale standards in the parties' lease constitutes a violation of CUTPA; and (9) the plaintiffs should be awarded compensatory damages pursuant to the CUTPA count of their complaint. We find no error

---

[4] "[General Statutes] Sec. 21-68a. EXEMPTION OF CERTAIN MOBILE MANUFACTURED HOMES FROM INSPECTION PROVISIONS OF STATE BUILDING CODE. Any mobile manufactured home manufactured prior to September 1, 1971, and any used mobile manufactured home sold on site or resited on an individual lot outside a mobile manufactured home park shall be exempt from any provisions of the state building code which would otherwise require a third-party inspection on resale or resiting. In the event of resale or resiting of a mobile manufactured home, the local building official in the town where the mobile manufactured home is to be located shall, upon the request of either party, inspect such unit and shall issue a certificate of approval in the case of an on-site sale or a certificate of occupancy in the case of a resiting, to the owner of such unit, provided such authority finds such unit safe for human habitation and the site meets local zoning requirements. A fee of not more than fifty dollars may be charged for such inspection by such building officials."

[5] The defendant in its brief also contended that General Statutes § 21-79 (a) is not constitutional because it is a denial of a park owner's first amendment right of freedom of association and an infringement upon the liberty of contract. Its brief provides no support at all for these claims. Those claims of error not briefed are considered abandoned. *Czarnecki* v. *Plastics Liquidating Co.,* 179 Conn. 261, 262 n.1, 425 A.2d 1289 (1979); *Katsetos* v. *Nolan,* 170 Conn. 637, 641, 368 A.2d 172 (1976); see Practice Book § 4065. Accordingly, we will not review these two constitutional challenges to that statute.

on the first seven claims, but error on the eighth and ninth. Accordingly, we remand the case to the trial court with direction to deny relief on the CUTPA count of the complaint and to recalculate the amount of compensatory damages.

The court found the following facts. On August 29, 1980, the plaintiffs purchased a used 1971 Newport mobile home from the defendant for $12,500. The mobile home was purchased "in place" on a lot in Harmony Acres Mobile Home Park, which the defendant owned, in the town of Prospect. On the date of purchase, the parties entered into a rental agreement for the lot for a period commencing on September 8, 1980, and ending on September 30, 1981. The rental agreement contained the following provision relating to the resale of this mobile home: "The owner hereby notifies the Resident that the resale of his mobile home is restricted by Section 4 of P.A. 74-333. Only mobile homes meeting the requirements of applicable federal, state and municipal laws may be sold in the park. The Resident may, where applicable, file with Owner a certificate from the local building official that the mobile home meets the requirements of applicable federal, state and municipal laws. Said certificate shall be filed with Owner prior to sale and shall be conclusive evidence of compliance. If such a certificate is not filed and the Resident sells his mobile home without the prior approval of the Owner, this lease shall automatically terminate and the mobile home be removed from the premises." Attached to and made a part of the initial rental agreement as appendix A was a copy of rules and regulations. Included in paragraph 10.1 of the rules and regulations was the statement that "[n]o mobile home over ten years old may be resold in place."

On September 30, 1981, the plaintiffs' lease was extended through September 30, 1982, by a written addendum. One of the attached rules and regulations

provided that "[n]o Mobile home over ten years old will be allowed to enter the park or [be] resold on the lot, unless it is built to ANSI-119.1 [American National Standards Institute] minimum specifications." The American National Standards Institute (ANSI), a body sponsored by the Mobile Homes Manufacturers Association, in 1973 established minimum standards for mobile homes. ANSI-119 provides standards for mobile homes concerning body and frame design, and construction requirements for the installation of plumbing, heating and electrical systems.

On September 29, 1982, the parties renewed the plaintiffs' lease until October 1, 1983. An addendum to this lease contained an identical provision providing that no mobile home could be resold on its lot unless it met ANSI-119 minimum specifications. The last addendum to the plaintiffs' lease was executed on August 9, 1983, extending the term from October 1, 1983, to September 30, 1984. Provisions regulating in-place resales were included in both the addendum itself and in the resale standards attached thereto. These resale standards contained a requirement that the plaintiffs obtain a zoning permit and a building permit from the town of Prospect as the original rental agreement of September 8, 1980, had provided, as a condition precedent to selling their mobile home on the lot.

On March 12, 1984, the plaintiffs sent a certified letter to the defendant notifying it of their desire to sell their mobile home. In response to this letter, Arthur Rourke, an independent mobile home broker acting on behalf of the defendant, inspected the plaintiffs' home. He found that the home was sited properly on its lot and that it was in saleable condition, but noticed that the home did not contain a seal certifying that it met ANSI-119 minimum specifications.[6] Following Rourke's

---

[6] The Mobile Home Construction and Safety Standard Act, 42 U.S.C. §§ 5401 through 5426, which became effective on June 15, 1976, required

inspection, the plaintiffs sent a second certified letter to the defendant in which they requested advice as to further steps that might be necessary to prepare for an on-site resale. The defendant sent a reply letter in which it stated that paragraph one of the resale standards effective on October 1, 1983, required that their mobile home bear a seal certifying that it met ANSI-119 and federal minimum specifications. In addition, this letter informed the plaintiffs that they had to obtain approval from the local building inspector for the wood stove in their home and also had to comply with the requirements of the resale standards attached to the last addendum concerning the permits from the town of Prospect.

After receiving that letter, the plaintiffs learned on April 1, 1984, from Jo Ann Boyce, an employee in the defendant's rental department, that a seal could not be obtained for the mobile home because it was built before 1976, when the federal government began requiring seals. Boyce informed the plaintiffs that they must sell their home "off-site." Two days later, Boyce contacted the plaintiffs and offered to buy their mobile home for the amount of the plaintiffs' initial purchase price of $12,500. The plaintiffs refused this offer.

The plaintiffs took a number of steps in order to sell their home on-site despite the fact that Boyce had told them that they could not do so. On June 6, 1984, a building official for the town of Prospect issued a "certificate of occupancy" approving the plaintiffs' wood stove. In June, 1984, the plaintiffs moved out of their mobile

---

that every mobile home sold in the United States bear an "approval seal" indicating that it met the mandatory minimum standards prescribed by the Department of Housing and Urban Development (HUD). No mobile home manufactured before June 15, 1976, can obtain the approval seal even if it meets the HUD standard because under the statute that seal may be affixed only at the time it is manufactured. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 582–83, 414 A.2d 1246 (1980). It is undisputed that the plaintiffs could not obtain a seal for their home.

home into a new home. In October, 1984, a prospective buyer offered to buy their mobile home on-site for $17,500. This buyer withdrew his offer when the defendant refused to permit an on-site sale. In November, 1984, the plaintiffs found a tenant ready to move into their mobile home at a rent of $375 per month with an option to purchase for $17,900. The defendant refused to accept this prospective tenant. On November 24, 1984, the defendant shut off the water connection to the mobile home. On April 10, 1985, a Prospect building official issued a "certificate of occupancy" approving the home for resale. Following a contested hearing, the commissioner of the department of consumer protection on April 15, 1985, issued a declaratory ruling that the resale standards in the parties' lease violated § 21-79 (b). Subsequently, the fire marshall of Naugatuck, in the company of the Prospect fire marshall, found that the home's electrical system was in sound condition and did not present a fire hazard. On October 30, 1985, a Prospect building official issued a "certificate of approval" in the form of a letter that found the plaintiffs' home to be safe and sanitary for human habitation and properly sited.

The defendant continued to maintain that the resale provisions of the rental agreement were valid and refused to allow the plaintiffs to sell their home on-site. When the plaintiffs brought this action against it, the defendant raised a number of special defenses. It contended that the commissioner of the department of consumer protection had exceeded his authority under General Statutes (Rev. to 1985) § 21-70 (c) in issuing a declaratory ruling, that its resale standards did not violate § 21-79, that § 21-79 was unconstitutional, that § 21-68a, the statute under which a Prospect building official had issued a certificate of occupancy, was unconstitutional, that the plaintiffs had failed to obtain the requisite zoning permit, and that a supplemental

judgment in another case required that the defendant enforce the resale provisions in the parties' lease. In rendering judgment for the plaintiffs, the court rejected all of these special defenses. This appeal followed.

I

The defendant first claims that the court erred in determining that the resale standards in the parties' rental agreement were not authorized by § 21-79.

Section 21-79 (a) provides that "a resident who owns a mobile manufactured home which is safe, sanitary and in conformance with aesthetic standards" shall not be required to remove the home from a mobile home development when it is sold.

Section 21-79 (b) provides: "A mobile manufactured home shall be presumed to be safe and sanitary if it is established that the mobile manufactured home was constructed in accordance with any nationally recognized building or construction code or standard. Failure to meet any such standard or the provisions of any such code shall not automatically raise a presumption that the mobile manufactured home is unsafe or unsanitary. Such failure shall not be used as a reason for withholding approval of an on-site sale unless such failure renders the mobile manufactured home unsafe or unsanitary."

Section 21-79 (c) provides: "The owner of a mobile manufactured home park shall bear the burden of showing that a mobile manufactured home is unsafe, unsanitary, or fails to meet the aesthetic standards of the development. No aesthetic standard concerning those physical characteristics such as size, original color or original building materials, which cannot be changed without undue financial hardship to the resident, shall be applied against a mobile home."

The defendant contends that the plaintiffs were bound by a provision in the resale standards incorporated into the rental agreement effective October 1, 1982, that prohibited the on-site resale of a mobile home more than ten years old unless it met the ANSI-119 minimum specifications. It maintains that this clause did not violate the requirement in § 21-79 (b) that failure to meet national standards "shall not automatically raise a presumption that the mobile manufactured home is unsafe or unsanitary."

The trial court first noted that the ten year provision was omitted from the resale standards effective on October 1, 1983. The court inferred from this omission that the defendant itself realized that this restriction had become untenable when § 21-79 (b) was substantially amended effective on October 1, 1983.[7] Public Acts 1983, No. 83-389, § 5. The court indicated that this ten year restriction violated § 21-79 (b), but did not elaborate the grounds for this determination.

The plain language of § 21-79 (a) allows a mobile home park resident to sell his mobile home on-site so

---

[7] Prior to the enactment of Public Acts 1983, No. 83-389, § 5, General Statutes (Rev. to 1983) 21-79 (b) provided: "Any purchaser of a mobile home sold by a resident may become a resident of the mobile home park provided he meets the entry requirements for said park and such requirements are equally applied by the owner to all purchasers and prospective residents and the owner approves such entry. Such approval may not be withheld except for good cause. For the purposes of this section good cause means a reasonable cause for the owner to believe (1) that such purchaser intends to utilize the purchased mobile home for an illegal or immoral purpose or for any purpose that would disturb the quiet enjoyment of the other residents of the park or (2) that the purchaser is or will be financially unable to pay the rent for the mobile home space or lot upon which the purchased mobile home is located. If the owner denies approval to a purchaser, he shall, in writing, state any reason for such disapproval. Such statement shall be delivered to the resident and the purchaser or prospective resident within ten days after the owner receives the completed application of the purchaser or prospective resident. Failure to deliver such notification within ten days shall be deemed to be approval."

long as it is "safe, sanitary and in conformance with aesthetic standards." Any restrictions that are not related to these criteria inevitably conflict with the legislative intention to make such homes transferable without removal so long as these three statutory specifications are satisfied. Although § 21-79 (b) creates a presumption that a mobile home constructed in accordance with a national standard, such as ANSI-119, is "safe and sanitary," it also provides that failure to meet such a standard "shall not automatically raise a presumption that the mobile manufactured home is unsafe or unsanitary." This subsection specifies further that "[s]uch failure shall not be used as a reason for withholding approval of an on-site sale unless such failure renders the mobile manufactured home unsafe or unsanitary." The requirement imposed by the defendant that the plaintiffs' mobile home, which was more than ten years old, meet the ANSI-119 specifications directly contravenes § 21-79 (b) by effectively raising a presumption that such noncompliance automatically makes the home unsafe or unsanitary and by allowing approval of an on-site sale to be withheld solely on that ground. This requirement also has the effect of relieving the defendant of its burden of proving that a home is "unsafe, unsanitary or fails to meet the aesthetic standards of the development," as § 21-79 (c) provides. Accordingly, we hold that the trial court did not err in determining that this resale standard was prohibited by § 21-79.

## II

The defendant claims next that the trial court erred in determining that General Statutes (Rev. to 1985) § 21-70 (c)[8] provided authority to the department of

[8] General Statutes (Rev. to 1985) § 21-70 (c) was substantially amended by No. 85-512 of the 1985 Public Acts, effective October 1, 1985. Prior to the enactment of these amendments, the department of consumer protection on June 6, 1985, had ruled that the resale standards in the parties'

consumer protection to approve resale standards, other than aesthetic ones.

Pursuant to § 21-70 (c) the defendant was required to submit to the department of consumer protection (department) the "lease provisions, rules or regulations, and aesthetic standards in effect . . . for review, approval and filing." On June 8, 1984, the department notified the defendant that the documents submitted did not comply with the pertinent statutes. Later, the defendant requested a declaratory ruling on the applicability of nationally recognized standards on the question of safety. On June 6, 1985, the department ruled that § 21-79 prohibited withholding approval for an on-site sale of a mobile home because of nonconformity with such standards.

We need address only summarily the defendant's claim that § 21-70 (c) limits the authority of the department in reviewing and approving the documents required to be submitted by mobile home operators solely to consideration of the aesthetic standards contained therein. This contention is adequately refuted by the text of the statute that "*all* lease provisions, rules or regulations *and* aesthetic standards in effect shall be submitted to the department of consumer protection for review, *approval* and filing." (Emphasis added.) This provision

---

lease were invalid under General Statutes § 21-79, and, therefore, these amendments are inapplicable to the case at bar.

Section 21-70 (c) currently provides: "Each owner shall file with the department of consumer protection copies of the park's rental agreements, aesthetic standards to be complied with by the owner and resident in the event of the sale of the mobile manufactured home by the resident, and rules or regulations concerning the resident's use and occupancy of the premises. Any change in the documents required to be filed under this subsection, other than a change in rent, shall be filed with the department of consumer protection. No rental agreements, aesthetic standards, or rules or regulations, and no changes in the terms or provisions of such documents, other than a change in rent, shall be effective until such documents or changes are filed with the department of consumer protection."

was applicable to leases and regulations in effect on October 1, 1983, including the lease at issue here for the period October 1, 1983, to September 30, 1984. It plainly authorizes the department to disapprove resale standards not conforming to law. Our conclusion in part I concerning the requirement imposed by the defendant that the plaintiffs' mobile home satisfy the ANSI-119 standard confirms the position of the department in this regard, but also renders the determination made by the department superfluous. This resale standard conflicts with the provision of § 21-79 (b) that approval of a resale may not be based simply upon failure to meet a national standard for mobile homes and thus is invalid.

### III

The defendant also claims that the trial court erred in determining that the plaintiffs had satisfied the requirements of the supplemental judgment in an unreported action the defendant had brought against the town of Prospect, *Liberty Mobile Home Sales, Inc.* v. *Prospect,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 106145 (September 23, 1982). It also maintains that the court erred in declining to decide whether such requirements were actually binding upon the plaintiffs. In that action the defendant in this case sought declaratory and injunctive relief against the enforcement of certain Prospect zoning regulations. The court in a supplemental judgment rendered on September 23, 1982, ordered "[t]hat all owners of mobile homes within the park will be required to obtain a building permit and certificate of occupancy from the Town prior to resale of their mobile homes . . . ."

Since the plaintiffs were not parties to the defendant's suit against the town of Prospect and were not notified of the supplemental judgment until they received

a letter from the defendant referring generally to a court "order that affects your lease," it is clear that they are not bound by the judgment under principles of res judicata or collateral estoppel. *State* v. *Fritz*, 204 Conn. 156, 172–73, 527 A.2d 1157 (1987). The judgment required that the defendant make present and future mobile home owners and residents of the park aware of the judgment "by incorporating it by reference in all leases and by other reasonable efforts." The defendant did comply with this provision in the lease in effect from October 1, 1983, to September 30, 1984, and thus the terms of the judgment bind the plaintiffs to the same extent as the other lease provisions but have no independent force.

As we have explained in part I, however, § 21-79 (a) prohibits the operator of a mobile home park from requiring for approval of the on-site resale of a mobile home anything more than that the home be "safe, sanitary and in conformance with aesthetic standards." Thus, the requirement of the 1982 supplemental judgment referred to in the lease that the plaintiffs "obtain a building permit and certificate of occupancy from the town prior to resale," like other resale provisions in the lease, is invalid because it imposes a requirement not sanctioned by § 21-79 (a). Although a provision for such a certificate might be a reasonably efficient method of satisfying the safe and sanitary statutory standard, it cannot be made a sine qua non to approval of a resale.

The claim of the defendant on appeal is that the trial court erred in regarding the two certificates of occupancy obtained from the town as sufficient to satisfy the provision requiring a building permit and certificate of occupancy to be issued by the town of Prospect before resale. The plaintiffs had obtained two certificates of occupancy, one approving their wood stove and the other finding that the mobile home was safe and

sanitary. Whether either or both of these documents satisfies the "building permit and certificate of occupancy" requirement of the judgment is immaterial because the statutory criteria for a resale include no such requirement. The defendant also contends that the supplemental judgment required that the plaintiffs obtain a zoning permit from the town of Prospect. Again, this requirement is irrelevant because the statutory criteria contain no such provision.

## IV

The defendant next claims that the trial court erred in failing to conclude that General Statutes § 21-68a is an unconstitutional delegation of legislative authority because the statute permits a local building inspector to inspect a mobile home to determine whether it is safe and sanitary, but does not provide any statutory standards for that determination. Section 21-68a provides in part: "Any mobile manufactured home manufactured prior to September 1, 1971, and any used mobile manufactured home sold on-site or resited on an individual lot outside a mobile manufactured home park shall be exempt from any provisions of the state building code which would otherwise require a third-party inspection on resale or resiting. In the event of resale or resiting of a mobile manufactured home, the local building official in the town where the mobile manufactured home is to be located shall, upon the request of either party, inspect such unit and shall issue a certificate of approval in the case of an on-site sale or a certificate of occupancy in the case of a resiting, to the owner of such unit, *provided such authority finds such unit safe for human habitation* and the site meets local zoning requirements." (Emphasis added.)

The defendant contends that this statute provides no standards for determining whether a home is "safe for human habitation" and, therefore, is an unconstitu-

tional delegation of legislative power. See *New Milford v. SCA Services of Connecticut, Inc.,* 174 Conn. 146, 148–51, 384 A.2d 337 (1977).

The court determined, however, that § 21-68a provides adequate standards when read in conjunction with General Statutes (Rev. to 1985) § 29-261,[9] which requires that building officials "shall have had at least five years' experience in construction, design or supervision and . . . shall be generally informed on . . . items of equipment essential for the safety, comfort and convenience of occupants . . . ." It noted that the legislature had enacted § 21-68a in 1976. Public Acts 1976, No. 76-143, § 1. Section 29-261 had remained substantially unchanged since 1969. Public Acts 1969, No. 443, § 6. The court pointed out that the legislature was presumed to have considered the existence of § 29-261 when it enacted § 21-68a. It concluded that local building officials were sufficiently expert in health and safety standards to understand fully and to apply the standards in § 21-68a. In addition, it determined that the building official who had inspected the home was well qualified and that "his inspections furnished adequate support for his conclusion that the plaintiff's mobile home was safe for human habitation." Finally, it noted that the defendant had failed to contend that the inspections were inadequate or that the home was unsafe.

We conclude that the court's finding that the home was safe for human habitation was not clearly erroneous in view of the expert testimony of William Scarpetti, a Prospect building official. *Mallory v. Mallory,* 207 Conn. 48, 55, 539 A.2d 995 (1988). Moreover, the defendant had the burden of showing that the home was unsafe

---

[9] General Statutes (Rev. to 1985) § 29-261 has been amended by No. 86-372 of the 1986 Public Acts and No. 87-55 of the 1987 Public Acts. These amendments have not affected the duties imposed on building inspectors discussed in the text of this opinion.

under § 21-79 (c) and did not present any such evidence. Accordingly, we need not decide whether § 21-68a is unconstitutional on its face because the statute was not applied in an unconstitutional fashion. A party "cannot mount a constitutional challenge to a statute on the basis of its possible applications in circumstances not presented by his own case, unless first amendment freedoms are affected, a situation not claimed to exist here." *State* v. *Madera,* 198 Conn. 92, 106, 503 A.2d 136 (1985).

V

The defendant also claims that the trial court erred in failing to conclude that § 21-79 (a) is unconstitutional because it amounts to an unjustified taking of property in violation of the fifth amendment to the United States constitution, which is applied to state governments under the fourteenth amendment's due process clause.[10] The takings clause of the fifth amendment provides: "[N]or shall private property be taken for public use, without just compensation."

The defendant contends that § 21-79 (a), which establishes that a mobile home that is "safe, sanitary and in conformance with aesthetic standards" may be resold on-site by the tenant who owns it, violates the takings clause in two ways. First, by entering into a lease a park owner virtually grants to the tenant a leasehold in perpetuity so long as he pays rent and obeys reasonable regulations established by the park owner. Second, the tenant may resell his home on-site to a new tenant who gains the same perpetual leasehold rights, although the park owner does retain limited authority under subsection (d) of the statute to reject a prospective buyer where there is reasonable cause to believe that he is financially unqualified or intends to use the home for an improper purpose.

---

[10] See footnote 5, supra.

The defendant relies heavily[11] upon *Hall* v. *Santa Barbara,* 833 F.2d 1270 (9th Cir.), reh. denied, 833 F.2d 1282 (9th Cir. 1987), cert. denied,      U.S.     , 108 S. Ct. 1120, 99 L. Ed. 2d 281 (1988). In *Hall,* a mobile home park owner challenged a Santa Barbara city ordinance that required such owners to offer their tenants leases of unlimited duration, terminable only for cause. In addition, the ordinance provided for rent control at below market rates. Id., 1273–74. The ordinance also allowed a tenant to transfer his interest to a new tenant. Id., 1276. The District Court in that case granted the city of Santa Barbara's motion to dismiss the park owner's complaint, which alleged that the ordinance constituted an inverse condemnation in violation of the takings clause of the fifth amendment to the United States constitution. Id., 1273–74. The Ninth Circuit reversed and held that the facts alleged in the complaint were sufficient to state a cause of action. Id., 1274–82. The case was remanded for further proceedings. Id., 1282. The *Hall* court emphasized that it was not resolving the claim on the merits. "Because there has been no trial, we cannot and do not express any view as to whether the Santa Barbara ordinance constitutes a taking." Id. The defendant contends, however, that the

---

[11] The defendant also relies on *Palm Beach Mobile Homes, Inc.* v. *Strong,* 300 So. 2d 881 (Fla. 1974), and on *Cider Barrel Mobile Home Court* v. *Eader,* 287 Md. 571, 414 A.2d 1246 (1980). Neither case is helpful in supporting the defendant's position that General Statutes § 21-79 violates the takings clause of the fifth amendment to the United States constitution. In *Palm Beach Mobile Homes, Inc.* v. *Strong,* supra, 887, the Florida Supreme Court found that the appellant's challenge under the takings clause to a Florida statute regulating mobile home park owners was moot and did not address this claim. In *Cider Barrel Mobile Home Court* v. *Eader,* supra, 580–81, the Maryland Court of Appeals held that a Maryland statute regulating mobile home park owners did not violate the takings clause. The *Cider Barrel Mobile Home Court* court relied in part on the fact that the statute did "not prevent a park owner from refusing to renew a lease" in determining that the statute was constitutional. Id., 581. The court did not address whether a statute that requires a park owner to demonstrate good cause for evicting a tenant would violate the takings clause.

*Hall* court strongly implied that the Santa Barbara ordinance constituted a taking under the fifth amendment.

"[United States] Supreme Court cases addressing this question can be divided into two lines of authority: the so-called regulatory taking cases and the physical occupation cases. Regulatory taking cases are those where the value or usefulness of private property is diminished by regulatory action not involving a physical occupation of the property. A typical case of this sort is *Penn Central Transportation Co.* v. *New York City,* 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 [reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 198] (1978), where New York City prohibited Penn Central from building a 55-story office tower over its Grand Central Terminal. Despite the drastic diminution in the value and usefulness of Penn Central's property, the Court held that the city's action did not amount to a taking.

"Physical occupation cases are those where the government physically intrudes upon private property either directly or by authorizing others to do so. A typical case is *Loretto* v. *Teleprompter Manhattan CATV Corporation,* 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982), where New York City authorized Teleprompter to string 36 feet of one-half inch coaxial cable and place two switchboxes, all amounting to about one and one half cubic feet, on a private building. Despite the minimal burden placed on the property owner, the Court in *Loretto* held that a taking had occurred." *Hall* v. *Santa Barbara,* supra, 1275.

The *Hall* court suggested that the Santa Barbara ordinance fell into the second category. "When viewed in the light most favorable to the Halls, the allegations of the complaint seem to present a claim for taking by physical occupation, as in *Loretto* . . . . Reduced to its essentials, appellants' claim is that the Santa

Barbara ordinance has transferred a possessory interest in their land to each of their 71 tenants; that this interest consists of the right to occupy the property in perpetuity while paying only a fraction of what it is worth in rent; and that this interest is transferable, has an established market and a market value. If proven, appellants' claims would amount to the type of interference with the property owner's rights the Court described so eloquently in *Loretto.* See *Fresh Pond Shopping Center, Inc.* v. *Callahan,* 464 U.S. 875, 104 S. Ct. 218, 78 L. Ed. 2d 215 (1983) (Rehnquist, J., dissenting from dismissal for want of substantial federal question)." Id., 1276.

We note initially that *Hall* is not binding precedent on this court, in contrast to a decision by the United States Supreme Court. In view of the procedural posture of the case, the *Hall* court did not reach the merits of whether the Santa Barbara ordinance violated the takings clause and that case at most provides dicta favorable to the defendant's position. Three judges on the Ninth Circuit dissented from the denial of an en banc rehearing of the case and strongly criticized the *Hall* court's reasoning in regard to whether the ordinance violated the takings clause. Id., 1282–84. We decline to apply the rationale of *Hall* to this case for two reasons. First, unlike the *Hall* court, we conclude that the modification of the common law right of the lessor to absolute control over the term of the lease and the identity of his lessee effectuated by § 21-79 in respect to mobile home parks is not sufficiently analogous to a physical occupation of property to violate the takings clause as interpreted by the decisions of the United States Supreme Court. Second, there are significant differences between our mobile home statutes in this case and the Santa Barbara ordinance.

There are significant differences in the degree of infringement upon common law property rights between

a governmentally authorized placement of wires and related devices by a private cable television company on a building without the consent of the owner, as in *Loretto,* and the right given by our statutes to mobile home owners and their transferees to continue to occupy the sites within a mobile home park that were originally leased to them or their predecessors for that purpose consensually. In *Loretto* the building, or portions thereof where the cable equipment was to be installed, had never previously been used for that purpose and the owner was being compelled to allow the attachment of objects to his building for the purpose of supplying a service to which he had never agreed. A mobile home park operator, however, at the point where § 21-79 applies, has already devoted the land upon which the mobile home being sold is situated to the same use for which the land will continue to be occupied beyond the original term of the lease by the same lessee or his transferee. He is not being compelled to permit his land to be occupied for a use to which he never consented.

The restrictions that our mobile home park statutes impose upon the operator's property rights consist of the option given by the statute to the original lessee to extend the term of the original lease indefinitely and to transfer this right to a purchaser of his mobile home. If a mobile home operator decides to use the land on which a mobile home is situated for some other purpose, he is given the right to dispossess the lessee upon giving a year's notice and thus may terminate the statutory options given to the tenant. General Statutes § 21-80 (b) (1) (E).[12] This statutory diminution in the common law rights of a landowner to control the use of his property simply does not rise to the level of a

---

[12] General Statutes § 21-80 (b) (1) (E) provides: "Notwithstanding the provisions of section 47a-23, an owner may terminate a rental agreement or maintain a summary process action against a resident who owns his mobile manufactured home only for one or more of the following reasons . . .

taking such as that involved in *Loretto,* where the owner was compelled to allow portions of his building to be occupied by equipment to be used for a purpose to which he had never consented.

In *Loretto,* the court plainly indicated that its conclusion that there had been a governmentally sponsored physical invasion of the apartment building by the attachment of cable equipment thereto against the wishes of the owner was not applicable to less apparent intrusions involved in regulating landlord-tenant relationships: "Finally, we do not agree with appellees that application of the physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships. This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. See, e.g., *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U.S. 241, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964) (discrimination in places of public accommodation); *Queenside Hills Realty Co.* v. *Saxl,* 328 U.S. 80, 66 S. Ct. 850, 90 L. Ed. 1096 (1946) (fire regulation); *Bowles* v. *Willingham,* 321 U.S. 503, 64 S. Ct. 641, 88 L. Ed. 892 (1944) (rent control); *Home Building & Loan Assn.* v. *Blaisdell,* 290 U.S. 398, 54 S. Ct. 231, 78 L. Ed. 413 (1934) (mortgage moratorium); *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U.S. 242, 42 S. Ct. 289, 66 L. Ed. 595 (1922) (emergency housing law); *Block* v. *Hirsh,* 256 U.S. 135, 41 S. Ct. 458, 65 L. Ed. 865 (1921) (rent control)." *Lorretto* v. *Teleprompter Manhattan CATV Corporation,* supra, 440.

---

"(E) A change in the use of the land on which such mobile manufactured home is located, provided all of the affected residents receive written notice at least three hundred sixty-five days before the time specified in the notice for the resident to quit possession of the mobile manufactured home or occupancy of the lot."

In *Fresh Pond Shopping Center, Inc.* v. *Callahan,* supra, the property owner challenged a Cambridge city ordinance that required him to obtain permission from the Cambridge Rent Control Board to remove property from the rental housing market. He claimed that the ordinance authorized a tenant of the shopping center to remain indefinitely. An equally divided Massachusetts Supreme Judicial Court affirmed the decision of the trial court that the ordinance as applied to the property owner did not violate the takings clause. Id. The United States Supreme Court dismissed the property owner's appeal for want of a substantial federal question. Id. Dismissals for want of a substantial federal question are decisions on the merits of the federal question presented to the court. *Mandel* v. *Bradley,* 432 U.S. 173, 176, 97 S. Ct. 2238, 53 L. Ed. 2d 199 (1973); *Troy Ltd.* v. *Renna,* 727 F.2d 287, 303 (3d Cir. 1984). Although *Fresh Pond Shopping Center, Inc.,* is of limited value as an authority because the majority, despite the lone dissent of Justice Rehnquist, did not provide an opinion, the case is significant to the extent that the court dismissed an appeal challenging under the takings clause an ordinance that in many ways is more onerous to property owners than our statute. In *Fresh Pond Shopping Center, Inc.,* the property owner could not remove an entire apartment building from the rental market in order to use the land for a different purpose. In addition, the Cambridge ordinance provided for rent control. As we have noted previously, § 21-80 (b) (1) (E) permits the operator of a mobile home park to terminate a rental agreement if he wishes to use the land for a different purpose, subject to a notice requirement of one year.

In *F.C.C.* v. *Florida Power Corporation,* 480 U.S. 245, 247–54, 107 S. Ct. 1107, 94 L. Ed. 2d 282 (1987), the United States Supreme Court recently held that the Federal Communications Commission (FCC) can

establish the rates that utility companies may charge cable television systems for using utility poles as supports for stringing television cable without violating the takings clause where the public utility had already entered into agreements for such use of the poles. The court concluded that economic regulation of an existing landlord-tenant relationship was quite different from the situation in *Loretto,* where the court had determined that a New York law requiring a landlord to permit a cable television company to install its cable facilities on his apartment building constituted a permanent physical occupation of property and, therefore, a taking under the fifth amendment. "As we observed in *Loretto,* statutes regulating the economic relations of landlords and tenants are not *per se* takings . . . '[s]o long as these regulations do not *require* the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.' *Loretto* [v. *Manhattan Teleprompter CATV Corporation,* supra, 440] (emphasis added)." *F.C.C.* v. *Florida Power Corporation,* supra, 252. "The line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license." Id., 252–53.

We conclude that § 21-79 as applied to the facts of this case does not involve the actual physical occupation of land for a public purpose, but merely regulates the use to which private property may be put. See id.; *Fresh Pond Shopping Center, Inc.* v. *Callahan,* supra; *Hall* v. *Santa Barbara,* supra, 1282–84 (Schroeder, J., dissenting). The defendant sold the home on-site to the plaintiffs and voluntarily entered into a rental agreement with them allowing use of the site for that purpose. The right given to the plaintiffs by our statutes to extend the original term of the lease is not equiva-

lent to a governmentally sponsored physical invasion of the defendant's land. The additional right to transfer to a mobile home purchaser the right to continued occupancy of the site, subject to rejection of the transferee for good cause as provided in § 21-79 (d), is quite similar to the common provision that a landlord may not unreasonably withhold his consent to the assignment of a lease by a tenant. Such a statutorily required condition of a lease agreement similarly does not amount to a taking of property for a use never consented to by the owner, as in *Loretto.*

We still must determine, however, whether regulation by the statute was so onerous as to constitute a taking of private property. In *Penn Central Transportation Co.* v. *New York City,* supra, 123–38, the United States Supreme Court concluded that whether an economic regulation violates the takings clause depends on the particular circumstances in that case and a balancing of the law's public purpose against the extent to which it diminishes the value of private property. See *F.C.C.* v. *Florida Power Corporation,* supra.

In *Cider Barrel Mobile Home Court* v. *Eader,* 287 Md. 571, 574, 414 A.2d 1246 (1980), the Maryland Court of Appeals noted that there was a nationwide problem concerning the rights of tenants in mobile home parks: "Despite the rising popularity of relatively low cost mobile homes, many communities have enacted zoning regulations which exclude them entirely or severely limit the areas where they may be placed, frequently restricting them to mobile home parks. Thus, the mobile home owner is compelled to rent space from the park owners who, because of the limited availability of space and the high cost of relocation, are able to dictate unfavorable rental terms and conditions. As a result, mobile home owners often have been forced to buy mobile homes from the park owner in order to obtain a site, to pay excessive entrance fees, to buy specified com-

modities from specified dealers, to pay the park owner a commission on the sale of the mobile home, or, upon sale, to remove it and pay an exit fee." See A Bill to Amend Section 2 of the National Housing Act Relative to Mobile Homes: Hearings on S.2740 Before the Subcomm. on Housing and Urban Affairs of the Comm. on Banking and Currency, 91st Cong., 1st Sess. 5 (1969) (statement of William B. Ross); L. Nyberg, "The Community and the Park Owner Versus the Mobile Home Park Resident: Reforming the Landlord-Tenant Relationship," 52 B.U.L. Rev. 810 (1972); R. Hightower, "Mobile Home Park Practices: The Legal Relationship Between Mobile Home Park Owners and Tenants Who Own Mobile Homes," 3 Fla. St. U.L. Rev. 103, 104 (1975).

In 1972 our legislature for the first time enacted statutes regulating mobile home parks. General Statutes (Rev. to 1975) §§ 21-64 through 21-76; Public Acts 1972, No. 186. In presenting the bill to the General Assembly, Representative Richard A. Dice stated: "It is needed mainly because most mobile homes in the state were zoned out by local towns leaving in effect nonconformed uses of these mobile home parks that now exist. As a result those park owners have a monopoly and as we have seen throughout our society monopolies often result in abuses. . . . It is a bill that helps the people who live in these mobile home parks which is mainly made up of people who are elderly, people who have just been married and people who are endeavoring to have housing without going on into low-income cost housing for the state." 15 H.R. Proc., Pt. 4, 1972 Sess, pp. 1706–1708.

In 1973, the General Assembly commissioned a report on the operation of mobile home parks in order to assess the extent to which additional regulation was needed. Office of Legislative Research, Mobile Home Parks in Connecticut (1973). The report concluded: "A basic

problem with mobile home living in Connecticut involves the landlord-tenant relationship in mobile home parks. Because most communities prohibit mobile homes or restrict them to a small number of established parks, there is a scarcity of land available upon which to place a mobile home. The immediate effect of this situation is to place owners of existing mobile home parks in an economically dominant position . . . ." Id., p. 4. The report found that park owners often refused to allow a tenant to sell his home on-site. Id., pp. 4–7. In 1974 the legislature first enacted legislation limiting the authority of park owners to restrict a tenant's right to sell his home on-site. General Statutes (Rev. to 1975) § 21-79; Public Acts 1974, No. 74-333, §§ 4, 12. In 1983 the General Assembly commissioned another task force to examine mobile home park regulations. Mobile Home Task Force, A Report to the Joint Standing Committee on General Law in Response to Special Act No. 82-49 (1983). The task force "found that, in some case[s], [mobile home] park owners do not permit [mobile home] owners to resell their older units in place . . . . This prohibits [mobile home] owners from obtaining equity from their housing investment . . . ." Id., p. 29. The legislature subsequently amended § 21-79. Public Acts 1983, No. 83-389, § 5.

We conclude that § 21-79 serves a substantial public purpose in protecting the economic interests of mobile home tenants in selling their homes on-site. It is undisputed that the plaintiffs' home purchased for $12,500 in 1980, was worth $17,500 at the time of trial if sold on-site, but was valued at most at $3500 if the buyer had to move it to another location. Section 21-79 protects tenants at mobile home parks from being forced to sell to park owners at a substantial loss and as a consequence benefits many low income people who cannot otherwise afford to purchase more expensive housing.

We also conclude that the statute does not unduly harm the economic interests of mobile home park owners. Unlike the ordinance in *Hall* v. *Santa Barbara,* our statute does not provide for rent control and limit the owner to a below market income. General Statutes § 21-80 (b) (5), of course, does require that rent increases on one tenant be "consistent with rents for comparable lots in the same park." There is no restriction, however, upon a general rent increase for all of the sites within a park. A land owner also may evict a tenant in order to use the site for any purpose other than as a lot for a mobile home, although one year's notice is required. General Statutes § 21-80 (b) (1) (E). The only evidence of economic harm that the defendant has presented is that the tenant who sells his mobile home on-site receives a greater price for his home than it would otherwise bring because of the right to continued occupancy of the site that is also transferred to the purchaser. Because of the scarcity of mobile home sites, resulting largely from zoning ordinances that bar the establishment of new mobile home developments, the legislature could reasonably have concluded that a substantial portion of the price paid for a mobile home purchased on-site is attributable to the continuing right to lease the site that accompanies the sale. If the mobile home park operator could require the site to be vacated, he, rather than the tenant, would be in the position to demand for a mobile home that he had placed on the site a price greater than the home itself would bring because of the right to continued occupancy that is incident to the sale. In choosing the tenant rather than the mobile home park operator as the recipient of this economic advantage arising from the near-monopoly status of the industry, the legislature, by allocating its benefit to those who generally are more in need, has not violated any constitutional principle. In our view, § 21-79 strikes a reasonably fair balance between the

economic interests of mobile home tenants and those of mobile home park operators. Accordingly, we conclude that the statute does not violate the takings clause of the fifth amendment to the United States constitution.

## VI

The defendant also claims that the trial court erred in concluding that General Statutes § 47a-4a applies to owners of mobile homes in a mobile home park and, therefore, in denying its counterclaim for the plaintiffs' failure to pay rent from December 1, 1984, through the date of judgment, August 31, 1987.

Section 47a-4a provides: "A rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7." Section 47a-7 (a) provides in part: "A landlord shall . . . (6) supply running water and reasonable amounts of hot water at all times . . . ." The court determined that the defendant had violated § 47a-7 (a) when he turned off all running water to the plaintiffs' home on November 24, 1984, and, accordingly, excused their failure to pay rent beginning on December 1, 1984, under § 47a-4a.

The defendant notes initially that the plaintiffs moved out of their home in June, 1984. It contends that the sole reason it shut off the running water on November 24, 1984, was to prevent waterline freeze-up from cold weather after the plaintiffs had already moved out of their home. The trial court, however, was not bound to credit the testimony offered by the defendant in support of this claim.

There was evidence from which the court could have concluded that the defendant's contentions about waterline freeze-up were a pretext to prevent the plaintiffs from selling or leasing their home. Stephen Eamiello

testified that he had provided for the winterization of his home by covering the water pipes with heat tape, checking the insulation in the pipes, and filling the home's heating tank with fuel oil, although there was no evidence indicating whether the defendant was aware of these preparations. The court found that the defendant in November, 1984, had refused to accept a new tenant that the plaintiffs had found for their home, just before it shut off the running water. In addition, the court found that the defendant had refused in October, 1984, to allow a prospective buyer to purchase the home on-site for $17,500. The defendant was clearly aware that the plaintiffs were actively seeking to rent or sell their home and had not abandoned it. In these circumstances, this court will not construe §§ 47a-4a and 47a-7 (a) so as to provide an exception to the defendant's obligation to provide running water. Accordingly, we conclude that the court did not err in denying the defendant's counterclaim for rent.

## VII

The defendant next claims that the trial court erred in issuing a permanent injunction prohibiting it from enforcing resale standards that the court had determined violated § 21-79. The defendant contends that money damages were an adequate remedy because the court could have required it to pay the plaintiffs the off-site value of the home, between $3000 and $3500, and also could have ordered the plaintiffs to convey title of the home to the defendant. Accordingly, the defendant maintains that injunctive relief was improper because an adequate remedy existed at law.

The court determined, however, that "[t]here is a substantial difference between the on-site and off-site values of the mobile home." A real estate appraiser testified on behalf of the plaintiffs that the mobile home had a value of $17,500 if it were sold on-site, but that

its value was at most $3500 if the buyer had to move it to another location. The defendant agrees with the appraiser's estimate. We conclude that the court did not abuse its discretion in finding that damages based on the off-site value of the mobile home were inadequate and in ordering a permanent injunction that permits the plaintiffs to sell their home on-site. *Berin* v. *Olson,* 183 Conn. 337, 340, 439 A.2d 357 (1981).

## VIII

The final claim of the defendant is that the trial court erred in concluding that the illegality of the resale provisions in the lease under § 21-79 constituted an "unfair or deceptive" act or practice in violation of General Statutes § 42-110b of CUTPA. For this violation the court awarded the plaintiffs compensatory damages of $5356.70, punitive damages of $12,000, "disbursed costs" of $1312.35 and attorney's fees of $26,405 plus taxable costs.

The court's determination that the defendant violated CUTPA was based upon its finding that the resale standard of the rental agreement, which required that the plaintiffs' home meet ANSI-119 minimum specifications before it could be sold on-site, contravened General Statutes (Rev. to 1985) § 21-79 and the public policy established by this statute. See *Conaway* v. *Prestia,* 191 Conn. 484, 492–93, 464 A.2d 847 (1983). The court emphasized that § 21-79 was "a plainly written (and constitutional) statute." The court found that the defendant's enforcement of that resale provision had caused a substantial injury to the plaintiffs by preventing them "from realizing the market value of their mobile home [if it were sold] on-site . . . ." In addition, the court found that the defendant's conduct was unethical and deceptive when it offered to assist the plaintiffs to acquire the building and occupancy permits required for resale by the rental agreement while

at the same time its enforcement of the ANSI-119 resale standard rendered compliance with the permit requirements "an exercise in futility." See *Conaway* v. *Prestia,* supra.

The defendant contends that it enforced this resale standard in the good faith belief that § 21-79 was unconstitutional both as written and applied. It notes that this statute had not yet been construed by our courts and maintains that a defense to CUTPA exists where a party refuses in good faith to obey a statute he believes is unconstitutional as applied to him.

The plaintiffs contend that good faith is not a defense to a CUTPA claim. They note initially that § 42-110b (b) provides that our courts "shall be guided by interpretations given by the Federal Trade Commission and the federal court to section 5 (a) (1) of the Federal Trade Commission Act [15 U.S.C. § 45 (a) (1)], as from time to time amended." They contend that good faith or the absence of an intent to deceive is irrelevant in determining whether a deceptive practice has been committed under the Federal Trade Commission Act. *Warner-Lambert Co.* v. *F.T.C.,* 562 F.2d 749, 763 n.70 (D.C. Cir. 1977), cert. denied, 435 U.S. 950, 98 S. Ct. 1575, 55 L. Ed. 2d 800 (1978); *Doherty, Clifford, Steers, & Shenfield, Inc.* v. *F.T.C.,* 392 F.2d 921, 925 (6th Cir. 1968); *F.T.C.* v. *Pharmtech Research, Inc.,* 576 F. Sup. 294, 301 (D.D.C. 1983). In *Web Press Services Corporation* v. *New London Motors, Inc.,* 203 Conn. 342, 363, 525 A.2d 57 (1987), this court concluded that "knowledge of falsity, either constructive or actual, need not be proven to establish a violation of CUTPA." The plaintiffs contend that the defendant's assertion of a "good faith" defense is inconsistent with our conclusion in *Web Press Services Corporation* that intent is not an element of a CUTPA action.

None of the cases relied upon by the plaintiffs, however, has addressed whether a finding of an "unfair or deceptive" act or practice may be based upon the failure to comply with a statute the constitutionality of which is being contested when there are reasonable grounds for making a constitutional challenge that ultimately proves unsuccessful. In this case the defendant relied in large measure upon the recent decision of the Ninth Circuit Court of Appeals in *Hall* v. *Santa Barbara,* supra, which does lend some support for its claim that § 21-79 is unconstitutional. Our conclusion that *Hall* is distinguishable and not sufficiently persuasive does not mean that there was no substantial basis for the defendant's challenge. Although the subjective good faith of one who has in fact performed an unfair or deceptive act is not a defense to a CUTPA violation, there is nothing unfair or deceptive in a reasonably grounded constitutional challenge of a statute. We do not believe that the legislature intended that the penalties authorized by CUTPA should be imposed upon those who have a reasonable basis for claiming that their constitutional rights have been violated and thus discourage them from asserting their rights. Whether there is such a reasonable basis is, of course, a question of law. In the present case, we have concluded that there was sufficient merit to the defendant's claim of unconstitutionality as to preclude a finding that its assertion was unfair or deceptive.

The ground upon which the trial court relied primarily for its conclusion of a CUTPA violation, that the ANSI-119 standard for resale was "in direct contravention with § 21-79, a plainly written (and constitutional) statute," therefore, is not a sufficient basis for a finding of an "unfair or deceptive" act or practice on the part of the defendant.

The alternative ground for the decision that a CUTPA violation had occurred was that the defendant had

"acted unethically in offering to aid the plaintiffs in the obtainment of [the certificates of occupancy] when its insistence on [the ANSI-119 standard] made any compliance with [the requirement for such certificates] an exercise in futility." This conclusion is also flawed because there is no indication in the finding that the plaintiffs sustained any damages attributable solely to the requirement of the lease for a certificate of occupancy or that their damages were increased because of that provision. Furthermore, the defendant was obliged by the judgment in the earlier suit against the town of Prospect to include that requirement in the lease and to attempt to enforce that provision of the lease. Accordingly, we conclude that the court erred in finding that the defendant had violated CUTPA, and, therefore, in awarding the statutory damages and attorney's fees to the plaintiffs.

The plaintiffs are entitled, however, to recover compensatory damages because the defendant breached their statutory right under § 21-79 to sell their home on-site. The plaintiffs in October, 1984, had found a purchaser who was willing to buy their home on-site for $17,500, but the defendant refused to allow this sale in violation of the statute. The defendant must compensate the plaintiffs for the damages for the delay that transpired from the time of that attempted sale until the date of the judgment, August 31, 1987, when a permanent injunction was issued that enjoined the defendant from interfering with the on-site sale of the home. The court awarded to the plaintiffs compensatory damages in the amount of $5356.70. Mortgage payments for the home, inclusive of principal and interest, paid between October 4, 1984, and August 31, 1987, represent $4591.05 of this amount. The defendant contends that the court erred in including the repayments of principal on the mortgage debt in calculating the amount of compensatory damages. We conclude that in respect

to the mortgage payments the plaintiffs should be compensated only for the interest paid during that time period. It is inappropriate to award the plaintiffs compensatory damages for the principal payments that increased their equity in the home and, therefore, reduced the amount of the mortgage to be paid off upon its resale. Accordingly, it is necessary to remand the case for a recalculation of the compensatory damages.[13]

There is error in part, the judgment is affirmed, except as to the awards for compensatory damages, punitive damages, "disbursed costs," and attorney's fees, which are set aside, and the case is remanded for further proceedings to determine the amount of compensatory damages to be awarded to the plaintiffs.

In this opinion the other justices concurred.

---

[13] It is not clear from the record whether the trial court has issued an order staying the enforcement of the permanent injunction until the resolution of this appeal. We note that the plaintiffs may be entitled to additional compensatory damages if the court has ordered such a stay.