**AZUL PACIFICO, INC., a California corporation, Plaintiff,**

v.

**CITY OF LOS ANGELES, a municipal corporation, Defendant.**

No. 87–2287–LEW.

United States District Court, C.D. California.

May 31, 1990.

Sherman Stacy, Santa Monica, Cal., for plaintiff.

Anthony Alperin, Gwendolyn R. Poindexter, Office of the Los Angeles City Atty., for defendant.

## MEMORANDUM OF DECISION

LAUGHLIN E. WATERS, Senior District Judge.

This case came on for trial before the Honorable Laughlin E. Waters, Senior United States District Judge on January 11, 1990. Sherman Stacey appeared on behalf of the plaintiff; Gwendolyn R. Poindexter, Deputy City Attorney appeared on behalf of the defendant.

## FACTS

*A. The Challenged Provision of the City's Rent Control Ordinance.*

Plaintiff is a family owned and controlled corporation which has the Tahitian Terrace Mobile Home Park as its principal asset. Plaintiff built the mobile home park in 1961 and has operated it continuously to the present. Tahitian Terrace is located in the City of Los Angeles in the Pacific Palisades community, a prestigious residential community where single family homes have sold from four hundred thousand to four million dollars. Tahitian Terrace is located on Pacific Coast Highway across from a state beach and many of the mobile homes in the park have ocean views.

In August 1978, the City of Los Angeles began to institute a rent control plan applicable to mobile home parks. The program began with a rent freeze and rollback of recently imposed rent increases followed by the adoption of Chapter XV, Article 1 of the Los Angeles Municipal Code, a rent stabilization ordinance (the "RSO"). City of Los Angeles Ordinance No. 152,120, effective May 1, 1979. This ordinance was altered in 1982 by Los Angeles Ordinance No. 156,597 § 9 which added new subsection 151.060.5 to the RSO. This new subsection was an exception to the provision permitting "vacancy decontrol." Vacancy decontrol requires a landlord to charge controlled rents to the current tenant but allows an increase to market rent when the tenant vacates the property. The new subsection prohibited a landlord from raising the rent level on a mobile home "pad" when the mobile home located upon the pad was vacated. Subsection 151.060.5 was repealed in 1984 by Los Angeles City Ordinance No. 158,891 § 3 which adopted a new section 151.06F. Subsection 151.06F, currently in effect, permits only one yearly rent increase and limits a rent increase upon vacancy of a mobile home to the highest rent charged for a comparable site located elsewhere in the park or ten percent, whichever is lower. It is this provision of the Los Angeles rent control ordinance that the plaintiff seeks to have declared an unconstitutional taking. In addition, the plaintiff has asked that the City be permanently enjoined from enforcing the vacancy control provision, and for damages for the alleged loss to the plaintiff caused by the ordinance. The plaintiff's claim is brought under 42 U.S.C. § 1983 and the fifth and fourteenth amendments to the United States Constitution.

*B. Factual and Legal Background of Mobile Home Park Rentals in Los Angeles.*

At this stage of the industry, the term "mobile" home is a misnomer. Modern mobile homes are not easily transportable from one location to another. Mobile homes are manufactured in one, two, three or more parts. In general, temporary axles and wheels are fastened to the mobile home sections which are transported by

trailer to a mobile home park where the sections are aligned, bolted, sealed, roofed, carpeted, wired, and plumbed. The cost of moving a mobile home can range from three to ten thousand dollars. In general, mobile home tenants tend to remain in the same park for many years and are a quite stable population of renters.[1] At Tahitian Terrace, for example, the average mobile home is sold once every thirteen years. Age may be a factor in the stability of the mobile home park population. In California, the average age of a mobile home park tenant is sixty-seven. Because of their age, the City's expert Prof. Sheehan testified that mobile home tenants are more likely to live on fixed incomes. Moreover, forty-three percent of the mobile home households in the City of Los Angeles are headed by women, according to the 1984 Hamilton, Rabinovitz Rental Housing Study.

There is a shortage of low cost housing in the City of Los Angeles, including mobile home rental space. The shortage of rental space has historically led to abuses of mobile home park tenants by landlords. For example, when park owners had the ability to evict tenants without cause, they were able to force a tenant to sell her mobile home to the owner at a fraction of its worth because the tenant had no place to which she could move her home. Sometimes landlords forced tenants to sell only to park owners, maintaining artificially low selling prices. In the past, park owners who were also mobile home retailers would promise buyers a space in the owner's park if they bought a home from him. Once the mobile home was sold, the park owner would evict an existing tenant and install the new one, and then repeat the process over again, ousting old tenants for new.

In 1978 the State of California enacted a Mobilehome Residency Law, Cal.Civ.Code §§ 798–798.86 (West 1982), which curbed some of these abuses. Under the Mobilehome Residency Law, for example, a land-

lord must execute a written rental agreement with a tenant. Cal.Civ.Code § 798.15 (West 1982). A landlord may not terminate a tenancy nor refuse to renew a tenancy except for cause. Cal.Civ.Code § 798.55 (West 1982). In addition, a landlord may no longer require a mobile home to be removed from his park upon sale of the home to a third person.

Against this state law background, the Los Angeles Rent Stabilization Ordinance provides further protection to tenants in the City's tight housing market. The Los Angeles RSO contains one section listing nine reasons for which a landlord may evict a tenant for cause. Los Angeles Municipal Code § 151.09. The RSO provides for periodic rent increase which are tied to the Consumer Price Index. Los Angeles Municipal Code § 151.06D. In addition, the RSO provides,

> If the site is voluntarily vacated by all the tenants as a result of a sale of the mobilehome (sic), and the mobilehome is not removed from the site, then the maximum rent or maximum adjusted rent may be increased by an amount not to exceed the rent on any existing comparable site in the park, or ten percent (10%), whichever is the lower.

Los Angeles Municipal Code § 151.06F.2. It is this ten percent cap which the plaintiff challenges.

## DISCUSSION

### A. Application of the Hall Analysis.

The parties agree that this case is controlled by the Ninth Circuit decision in *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1986) *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). The plaintiffs in *Hall* were owners of a mobile home park subject to a rent control ordinance enacted by the City of Santa Barbara. Under the ordinance, mobile home park landlords were required to grant tenants leases of unlimited duration. The

---

1. The 1984 Hamilton, Rabinovitz Rental Housing Study prepared for the City revealed that for eighty percent of all mobile home residents in Los Angeles their current mobile home park space is the first they have ever rented. In California, only three percent of mobile home coaches have been moved from the site of their first installation. Hirsh, "An Inquiry Into Effects of Mobile Home Park Control," 24 *Journal of Urban Economics* 24 (1988).

plaintiffs in *Hall* argued that the ordinance was a taking of their property. They argued that,

> by giving tenants the right to a perpetual lease at a below-market rate, the ordinance transfers to each of them a possessory interest in the land on which their mobile home is located. According to the Halls, this interest has a market value and a market: the market for mobile homes located in mobile home parks. According to the Halls, the price of mobile homes in their park shot up dramatically after enactment of the ordinance, with many selling far above blue book value. They claim that the substantial premium paid for mobile homes in parks subject to the Santa Barbara Ordinance reflects the transfer of a valuable property right to occupy mobile home parks at below-market rates.

833 F.2d at 1274. The *Hall* court agreed with the plaintiffs. The court classified the *Hall* facts as stating a claim for a "physical occupation" taking of plaintiffs' property under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1988). *Hall* requires a three-part analysis: 1) whether the governmental action amounted to a taking of property; 2) whether it advanced a legitimate governmental interest; and 3) whether there was just compensation. If this Court finds a taking and that there was either no legitimate governmental interest or no just compensation, the plaintiff will prevail.

### 1. Was There a Taking?

■ The *Hall* court found that Santa Barbara rent control ordinance effected a physical occupation taking of the plaintiffs' property because it transferred a property right from the landlord to the tenant. In that case, the property right was the right to occupy in perpetuity the land on which their mobile home was located while paying less than its market worth in rent, which right was transferable, had a market value and a market. This Court finds all these elements to be present in this case and accordingly finds that the Los Angeles

RSO effects a physical occupation taking of the plaintiff's property.

Unlike the ordinance challenged in *Hall*, the Los Angeles RSO does not specifically require the landlord to grant the tenant a lease of unlimited duration. The plaintiff argues, however, that the combination of the RSO provision prohibiting a landlord from evicting a tenant except for cause and the state Mobilehome Residency Law is the functional equivalent of a lease of indefinite term. *See* Los Angeles Municipal Code § 151.09; Cal.Civ.Code § 798–798.86 (West 1982). This Court agrees that even though the RSO does not by its own terms require a lease of indefinite duration, the practical result of the RSO against the background of state law is just that. For example, under the RSO, a landlord may evict a subtenant in possession of the mobile home at the end of the lease if the subtenant was not "approved" by the landlord. Los Angeles Municipal Code § 151.09(A)(7). However, under state law the landlord may exercise approval rights only if he reserved them in the original lease, and then only if the subtenant cannot pay the rent when due. Cal.Civ.Code § 798.74 (West 1982). Another example of the combined effect of the state and municipal laws involves the provision of the RSO which authorizes the landlord to evict a tenant if the tenant refuses to renew a tenancy under the same terms as the prior tenancy. Los Angeles Municipal Code § 151.09(A)(5). The RSO itself does not require the landlord to offer to renew the tenancy, only that if the landlord does so and the tenant refuses the offer, the landlord may evict. Under state law, however, the landlord *must* offer to renew a tenancy. Cal.Civ.Code § 798.55(b) (West 1982). Again this has the effect of obligating the landlord to offer a lease of indefinite term.

The City argues that it is not the RSO, but the state Mobilehome Residency Law which forces a landlord to offer a tenant a lease of indefinite term, therefore this Court cannot find the ordinance to be unconstitutional. The City made this argument during pretrial motion practice and it is no more convincing to this Court now than it was then. In this Court's Memoran-

dum of Decision Re: Defendant's Motion to Dismiss, filed December 2, 1987, this Court wrote,

> [t]he Los Angeles rent control ordinance does not operate in a vacuum. Presumably the drafters of the ordinance knew of the state statute when the ordinance was enacted. The combination of the ordinance and the state statute, as alleged in the complaint, cause the effect articulated in *Hall*, specifically that the limitation on rents under the ordinance allows a tenant to sell a mobilehome at a premium.

Municipal ordinances are subordinate to state statutes and to the extent they conflict with state statutes, they are invalid. Sutherland, *Stat. Const.* § 30.01 (4th Ed.). However, there is a presumption that state and municipal laws regulating the same conduct can oeprate harmoniously. *Id.* § 30.05. The Los Angeles RSO and the California Mobilehome Residency Law do not conflict, and there is no evidence to rebut the presumption that they operate harmoniously. Moreover, to adopt the City's position would in effect create a loophole in judicial protection of constitutional rights. Under the City's scheme, states and municipalities could conceivably conspire with one another to enact unconstitutional regulatory schemes, each one enacting laws which are not unconstitutional on their own, but which have an unconstitutional effect in conjunction with one another. If. this Court were to adopt the City's argument, it would have no way to protect the individual rights of citizens against the power of the state and its municipal subdivision because neither law could be invalidated as unconstitutional.

Moreover, it is the fact that rents cannot be raised more than ten percent when a tenant sells his mobile home and the buyer remains on the same pad that works the unconstitutional taking under *Hall*, not the state law requiring the landlord to renew a tenancy upon expiration of the original lease. Such a state law may well be constitutional. *See, e.g., Eamiello v. Liberty*, 208 Conn. 620, 546 A.2d 805 (1988), *appeal dismissed, Liberty v. Eamiello*, —— U.S.

——, 109 S.Ct. 1104, 103 L.Ed.2d 169 (1989). It was only when the RSO created the ability in the tenant to sell his mobile home at a premium that the taking occurs. This ability to transfer the landlords property right to the buyer was created by the RSO, not the state law.

The Los Angeles RSO transfers a property right, the right to occupy in perpetuity a mobile home park pad at reduced rent. Under *Hall*, in order to constitute a taking, that property right must be transferrable, have a market value, and actually be traded in a market. 833 F.2d at 1276. The plaintiff has met its burden proving these three elements in this case. Plaintiff's expert William N. Kinnard, Jr. testified that if a mobile home located and intended to remain on a pad in a rent controlled park sells for more than a comparable home and pad located in a non-rent controlled park, this is evidence both that the landlord's property right has been transferred from the outgoing tenant to the incoming tenant and that the outgoing tenant was paid for that transferrable right. Both the plaintiff's expert Robert Foreman and the defendant's expert Robert Lea testified, after accounting for all other variables, that the homes in plaintiff's park sold at prices higher than comparable homes situated in comparable non-rent controlled parks. The plaintiff's expert estimated the value of the premium as no less than $20,800 on average, while the defendant's expert valued the premium at approximately $5,000 per home, an amount he described as "nominal."

Defendant's expert Professor Michael F. Sheehan testified that there are other explanations for the price differentials for sales between mobile homes sold in the plaintiff's park and comparable homes sold in non rent-controlled parks. The City argues that these alternative explanations undermine the plaintiff's proof of the existence of a market for the right to remain in perpetuity at reduced rents in rent-controlled parks. First, Prof. Sheehan testified that the prices reflect the buyers' interest in a regularized rent scheme which prevents arbitrary, extreme jumps in rent, not the fact that the rent levels per se are

controlled. Essentially, what Prof. Shee-han characterizes as two interests are simply two ways of saying the same thing. The rent setting process is "regularized" under the rent control ordinance because rents cannot be raised beyond a percentage reflecting the Consumer Price Index, and rent levels are controlled because rents are determined by a regulated scheme. At any rate, the distinction is meaningless under *Hall* which looks for a market for the right to occupy in perpetuity at less than market rent, not necessarily at the same rent level forever. Second, based on the Lea report, his interviews of tenants and the plaintiffs, Prof. Sheehan testified that he does not believe there is a market for the property right. He found that the majority of tenants were ill informed about rent control and were unable to assign a present value to such a right. He testified that the purchaser's willingness to pay a certain price was based on their wealth and income and the customary price as conveyed to them by their broker. This testimony does not discredit the inference from the sales price differentials that a market for the property right exists. The testimony does not explain why, other than to obtain the right to occupy a pad at a reduced rent, the buyers of homes in the plaintiff's park did not choose to buy cheaper homes in a park where rents were somewhat higher. Moreover, Sheehan's testimony about the buyer's lack of knowledge of economics does not mean that the market does not exist, it merely shifts the knowledge about the value of the property right from the buyers to the brokers, who act as agents of the buyers. Under the test articulated in *Hall*, the Los Angeles rent control ordinance effects a physical occupation taking of the plaintiff's property.

### 2. Did the Plaintiff Receive Just Compensation?

■ In determining what constitutes "just compensation," for a takings claim under the fifth and fourteenth amendments, courts generally look to the owner's loss rather than the gain of the entity causing the taking to measure the amount of compensation. *Kimball Laundry Co. v.*

*United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). The owner's loss is usually measured by the extent to which the taking deprived him of an interest in his property. *See U.S. v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). However, courts must look to the individual facts of each case. *See Dore v. United States,* 97 F.Supp. 239, 119 Ct.Cl. 560 (1951); *Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638 (Fed.Cir.1987). "Just compensation" means the full monetary equivalent of the property taken. *U.S. v. Reynolds,* 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). Although the *Hall* court in reversing the district court's dismissal of the plaintiffs' action did not reach the factual issue of just compensation, the opinion does provide some guidance on how to apply the general rules of just compensation to a physical occupation taking in this context.

■ The *Hall* court rejected the defendant's argument that the plaintiffs were adequately compensated because they were provided a fair return on their investment under the rent control ordinance. The court held that, although this test is used to determine just compensation in regulatory takings cases, this was not the test used in physical occupation takings cases. The court stated in dicta,

> [h]ere the rental payments compensate the Halls for use of the land during the rental period, plus whatever amenities they provide tenants. However, if their claim is substantiated, the Halls are entitled to additional compensation for the taking of their property: the possessory interest in the land allegedly transferred to each of their tenants.

833 F.2d at 1281. The City of Los Angeles makes an argument similar to that of the defendant in *Hall*. The City argues that the park owners receive a fair return on their investment under the rent stabilization ordinance. The City also argues that the park owners have received compensation in kind as well. Because the RSO encourages permanency, the City argues, tenants have installed permanent improvements in the park which increase the value

of the park and compensate the park owners beyond that provided for under the ordinance. Despite the appeal of these arguments, this Court is bound by the precedent established in *Hall*, according to which only the exact monetary equivalent of the property interest allegedly transferred to the tenants constitutes "just" compensation.

The plaintiff would have damages measured by the difference between rent received and market rent on each mobile home located within its park which has been sold since the ordinance went into effect. The plaintiff also seeks prospective damages. In support, the plaintiff has provided an extensive market rent analysis of the mobile home park for the years 1982 to 1989, which compares the rent charged at Tahitian Terrace with that charged at comparable parks located in non-rent controlled districts. The City argues that the plaintiff is not entitled to any damages, but agrees to that measure of damages if this Court finds that the plaintiff has been damaged in a constitutional sense by the RSO. The City submitted its own market rent analysis which contains figures that, not surprisingly, lead to a much smaller figure for damages. Moreover, the City adduced evidence that the owners of Tahitian Terrace did not charge the maximum allowed under the ordinance for many years. Therefore, the "rent received" figure provided by the plaintiff would have to be increased to the amount it could have charged legally under the RSO. The City produced an expert witness, James Fleck, to testify to what that amount would have been.

However, the expert testimony of Prof. Sheehan convinces this Court that the measure of damages proposed by the parties is not appropriate under *Hall*. Prof. Sheehan correctly explained the plaintiff's theory of damages as asserting a direct correlation between the gain received by tenants when they sell their mobile home in place and the loss to the landlord. The expert disagreed with the assertion that there is a correlation between the two. Prof. Sheehan testified that the loss to the landlord caused by the RSO should be measured by the lost rental income stream, which is the capitalized value between the rents the landlord could have charged without the RSO and the maximum rents the landlord charged with the RSO. Prof. Sheehan argues that, in an efficient mobile home park market, this loss would be reflected immediately in a lower market value for the *mobile home park*. Prof. Sheehan testified that whether or not the tenant receives a premium upon the sale of his mobile home is irrelevant to the loss to the landlord caused by the RSO. Prof. Sheehan provided a convincing example: suppose a landlord could charge a monthly market rent of $600.00 on a given pad, but is forced to charge an artificially low price of $500.00 because of the RSO. The landlord loses the capitalized value of $600.00 minus $500.00. If the tenant sells his coach and the landlord raises the rent by ten percent as permitted under the RSO, his loss is reduced. This is because he may now charge $550.00 per month ($500.00 + (10% × $500.00)), so his loss due to the RSO is only the capitalized value of $600.00 minus $550.00. This amount of loss is the same regardless of whether the tenant receives a premium or not upon sale of the mobile home.

The *Hall* opinion makes clear that just compensation in this context must be determined by the amount of the premium the selling tenant gained rather than the loss to the landlord. The *Hall* court stated,

[t]o make this determination, the court must ascertain the value of the interest allegedly transferred to each tenant and the value of what the Halls received, if anything, in addition to normal rental payments.

833 F.2d at 1281. The *Hall* court, breaking from the traditional "loss" measure of damages for takings cases, requires this Court to look to the windfall gain of the tenants caused by the RSO and award that amount to compensate Azul Pacifico.

The parties have produced adequate evidence of this windfall to enable this Court to render a decision on damages. The plaintiff's expert, Robert Foreman, testified to the amount of this premium. Mr. Foreman compared the sales prices of

coach which sold in Tahitian Terrace with the sales prices of identical or nearly identical coaches located in comparable parks, using the Kelly Blue Book as a standard.[2] Based on this study, the plaintiff's expert determined that the tenants at the plaintiff's park sell their mobile homes for an average of $20,880.00 more than tenants selling similar homes in comparable non-rent controlled parks. The City's expert Robert Lea also testified to the amount of the premium. Mr. Lea used the sales comparison approach to determine a value, if any, of the sales premium. Mr. Lea found a "nominal" difference in the sales prices of mobile homes caused by the RSO, which he valued at $5,000.00 per home.[3] Based upon his interviews with park owners, managers, brokers and mobile home owners, Mr. Lea formed the opinion that rent control is not one of the primary features considered by mobile home purchasers, but did note that buyers take comfort from the fact that rent levels are stabilized by the City. The plaintiff's witnesses contradict this opinion. For example, one occupant of Tahitian Terrace, Louise Morrison, testified that she bought her mobile home in 1988 for $77,000.00. She then immediately sold the coach for $5,000.00 and purchased a new coach for $39,000.00 which she placed on her lot. From her testimony, it is clear that the right to occupy a rent-controlled lot contributed at least in part to her motivation to pay so much for a coach apparently worth so little.

■ In its Order Denying Defendant's Motion for Summary Judgment Re: Statute of Limitations dated February 1, 1990, this Court ruled that the continuing wrong theory for the accrual of the statute of limitations applies in this situation where the injury to the plaintiff occurs each time a mobile home located in its park is sold. *See United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1946); *see also Barbaccia v. County of Santa Clara*, 451 F.Supp. 260, 266 (N.D. Cal.1978). Under the continuing wrong theory, although the statute of limitations is tolled as to the cause of action, damages are limited by the state statute of limitations. *Jackson v. City Council of Charlottesville*, 659 F.Supp. 470, 475 (W.D.Va. 1987) *aff'd in part and vacated in part without opinion*, 840 F.2d 10 (4th Cir. 1988). The applicable California statute of limitations limiting damages in this case is one year. *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir.1987). Therefore, the plaintiff is entitled to recover damages for losses occurring one year prior to the filing of the complaint on April 27, 1987 to the time of trial. Because the plaintiff's loss occurs whenever a mobile home located in its park is sold, damages will be calculated by multiplying the number of coaches sold during that period (48) by the amount of the premium received on the sale (an average of $20,880). The evidence showed a total of forty-eight sales during the applicable period. This Court finds the average premium to be $20,880.00 based on the plaintiff's more comprehensive study.

2. Argument was heard at trial about the accuracy and usefulness of the Kelly Blue Book. The Kelly Blue Book is a guide for resale prices of mobile homes, reflecting the national average prices for mobile homes. The City's experts argued that the Kelly Blue Book is a highly inaccurate measure for determining the value of a mobile home. However, this Court has used the Kelly Blue Book not to determine the value of the mobile homes sold in the plaintiff's park, but as a measuring stick to determine the amount of the alleged sales premium caused by the RSO. For example, if a mobile home in the plaintiff's park sells for $10,000.00 over the Kelly Blue Book price, and a mobile home of the same make, model and year located in a comparable, but non-rent controlled park sells for $5,000.00 over the Kelly Blue Book price, this is evidence of a premium of $5,000.00 caused by

the rent control ordinance. Adjustments were made by the plaintiff's expert for such factors as park location, view and optional equipment.

3. This Court does not agree with Mr. Lea's opinion that a $5,000.00 premium per mobile home is a "nominal" amount. In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the leading physical occupation taking case, the burden imposed upon the plaintiff amounted to one and one half cubic feet of cable wire placed upon the plaintiff's building, yet the Supreme Court found a taking, and remanded to the state court for a determination of just compensation. Certainly the taking created by the Los Angeles RSO is not "nominal" compared to the taking in *Loretto*.

The plaintiff correctly argues that it need not show that it was deprived of the entire leasehold value of its property by operation of the RSO. While that test for just compensation is utilized in regulatory takings cases, it is not applicable to physical occupation takings. Likewise, the plaintiff is not required under *Hall* to exhaust administrative remedies before bringing its takings claim.

The plaintiff seeks future damages as well for mobile homes that will sell at a premium in the future. This Court agrees with the City that damages for future loss are too speculative because it is impossible to determine how many coaches will both sell and remain in the park in the future. *See Harmsen v. Smith,* 693 F.2d 932, 945 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Bergen v. F/V St. Patrick,* 816 F.2d 1345 (9th Cir.1987).

### 3. Was There a Legitimate State Interest?

Under *Hall,* if there was a taking and just compensation was not made, it is not necessary for the plaintiff to prove a lack of a legitimate state interest in order for the plaintiff to prevail. 833 F.2d at 1275. In this case, the plaintiff does not argue that there was no legitimate state interest in enacting the Rent Stabilization Ordinance, including the vacancy control provisions. As the Declaration of Purpose of the RSO states,

> There is a shortage of decent, safe and sanitary housing in the City of Los Angeles resulting in a critically low vacancy factor.
>
> Tenants displaced as a result of their inability to pay increased rents must relocate but as a result of such housing shortage are unable to find decent, safe and sanitary housing at affordable rent levels. Aware of the difficulty in finding decent housing, some tenants attempt to pay requested rent increases, but as a consequence must expend less on other necessities of life.

\*   \*   \*   \*   \*   \*

Therefore, it is necessary and reasonable to regulate rents so as to safeguard tenants from excessive rent increases, while at the same time providing landlords with just and reasonable returns from their rental units.

The legislative history of the RSO makes clear that the vacancy control provision for mobile homes which are sold and intended to remain on the same pad was enacted specifically to protect the substantial investments of tenants in a distorted market where demand far exceeds supply. *See* Report and Recommendation from the Government Operations Committee of the Council of the City of Los Angeles to the City Attorney dated August 9, 1983 (Defendant's Exhibit 292–8). According to the report, vacancy control for mobile homes sold on the pad was enacted "[i]n order to more fairly apportion any economic gains between the mobilehome (sic) park owner and mobilehome unit owner ("tenant") which result from the sale of a mobilehome *which remains on its pad,* while still preventing excessive post-sale rent hikes for mobilehome spaces (pads) which might prevent the sale of the unit ..." (emphasis in the original). Based on testimony from mobile home tenants, the City found that, without vacancy control, it would be virtually impossible for tenants to sell their homes on the pad because landlords could raise the rent to a level that prospective buyers could not afford.

The Supreme Court has long held that protection of consumer welfare is a legitimate and rational goal of price control. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968). Included in this is the protection of tenants and their standard of living. *See Bowles v. Willingham,* 321 U.S. 503, 513, 64 S.Ct. 641, 646, 88 L.Ed. 892 (1944) *cited in Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). In *Pennell,* the Supreme Court found the City of San Jose's rent control ordinance was not "facially invalid" under the due process and equal protection clauses. *Pennell* reiterated a long line of Supreme Court precedent which approves government interference in a market where

prices are inflated because of a monopoly or near monopoly. *See, e.g., FCC v. Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987); *Block v. Hirsh*, 256 U.S. 135, 156, 41 S.Ct. 458, 459, 65 L.Ed. 865 (1921) (approving rent control in Washington, D.C., on the basis of Congress' finding that the housing market there was monopolized).

The *Pennell* court also rejected the argument of some *amici* that rent control is a per se taking. 108 S.Ct. at 587, n. 6. Rent control has long been held constitutional as a legitimate exercise of the state's police power. Citing *Loretto*, the Court wrote, "we have 'consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.'" *Id.* The Court in *Loretto* wrote that the *Loretto* decision itself would not have "dire consequences for the government's power to adjust landlord-tenant relationships.... (because) [i]n none of these cases ... did the government authorize permanent occupation of the landlord's property by a third party" (referring to the long string of Supreme Court precedent upholding rent control as constitutional) 458 U.S. at 438, 102 S.Ct. at 3177. Unfortunately the Supreme Court apparently did not envision the *Hall* decision in which *Loretto*'s narrow physical occupation holding was expanded to apply to mobile home vacancy control.

Mobile home rent control differs significantly from rent regulation of apartments due to the nature of a mobile home as a significant financial investment for the mobile home park tenant. The City has determined, however, that these tenants are just as vulnerable and in need of the same types of protection as apartment renters. However, the Ninth Circuit in *Hall*, applying market theory and finding that rent control creates a "physical occupation" taking if it transfers a property right for which there is a "market," a "market value" and actual transfer, has established a precedent that this Court may not ignore. The mobile home market is an example of a monopoly, which is a market *failure*, rather than a market, and is a prime candidate for government regulation, but under *Hall*, this Court must invalidate the vacancy control provision of the City's Rent Stabilization Ordinance as an unconstitutional taking in violation of the fifth and fourteenth amendments. A permanent injunction will issue.

The foregoing constitutes the Court's findings of fact and conclusions of law as prescribed by Rule 52(a) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.