MORRIS THOMPSON, ADMINISTRATOR (ESTATE OF FRIEDA SOUSA) v. MERLINO ENTERPRISES, INC.
(13244)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

---

Argued May 4—decision released August 16, 1988

*Thomas G. Moukawsher,* with whom, on the brief, was *Joseph E. Moukawsher,* for the appellant (defendant).

*Chester Fairlie,* for the appellee (plaintiff).

*Stephen R. Park,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Robert M. Langer, William M. Rubenstein* and *John M. Looney,* assistant attorneys general, for the state of Connecticut as amicus curiae.

PER CURIAM. In this action the plaintiff, Morris Thompson, administrator of the estate of Frieda Sousa, owner of a mobile home, sought monetary damages against the defendant, Merlino Enterprises, Inc., which owns the lot on which the home was located before the defendant removed it in January, 1985. The administrator alleged in his complaint that the defendant had interfered with his right to sell the decedent's mobile home in violation of General Statutes § 21-79.[1] An

---

[1] "[General Statutes] Sec. 21-79. OWNER PROHIBITED FROM RESTRICTING RESIDENT'S RIGHT TO SELL. (a) No owner or operator of a mobile manufactured home park shall require a resident who owns a mobile manufactured home which is safe, sanitary and in conformance with aesthetic standards to remove the home from the development at the time such mobile manufactured home is sold or a mortgage on such a home is fore-

attorney state trial referee, George Kanabis, recommended judgment for the administrator to recover compensatory damages in the amount of $11,500 and also

closed provided that the purchaser or foreclosing mortgagee shall assume and be bound by the rental agreement of the foreclosed mortgagor and shall be bound by the rules and regulations of the park.

"(b) A mobile manufactured home shall be presumed to be safe and sanitary if it is established that the mobile manufactured home was constructed in accordance with any nationally recognized building or construction code or standard. Failure to meet any such standard or the provisions of any such code shall not automatically raise a presumption that the mobile manufactured home is unsafe or unsanitary. Such failure shall not be used as a reason for withholding approval of an on-site sale unless such failure renders the mobile manufactured home unsafe or unsanitary.

"(c) The owner of a mobile manufactured home park shall bear the burden of showing that a mobile manufactured home is unsafe, unsanitary, or fails to meet the aesthetic standards of the development. No aesthetic standard concerning those physical characteristics such as size, original color or original building materials, which cannot be changed without undue financial hardship to the resident, shall be applied against a mobile home.

"(d) Any purchaser of a mobile manufactured home sold by a resident may become a resident of the mobile manufactured home park provided he meets the entry requirements for said park and such requirements are equally applied by the owner to all purchasers and prospective residents and the owner approves such entry. Such approval may not be withheld except for good cause. For the purposes of this section good cause means a reasonable cause for the owner to believe (1) that such purchaser intends to utilize the purchased mobile manufactured home for an illegal or immoral purpose or for any purpose that would disturb the quiet enjoyment of the other residents of the park or (2) that the purchaser is or will be financially unable to pay the rent for the space or lot upon which the purchased mobile manufactured home is located. If the owner denies approval to a purchaser, he shall, in writing, state any reason for such disapproval. Such statement shall be delivered to the resident and the purchaser or prospective resident within ten days after the owner receives the completed application of the purchaser or prospective resident. Failure to deliver such notification within ten days shall be deemed to be approval.

"(e) Any resident wishing to sell his or her home shall request a written statement of the owner's intentions regarding the condition of the home. Within twenty days after receipt of such a request, the owner shall approve the home's condition for resale or deliver a written statement to the resident specifying the reasons why the home is not safe, sanitary, or in conformance with aesthetic standards. Failure of the owner to respond within twenty days shall be deemed to be an approval of the home's condition for resale. If the resident disputes the owner's response, he may seek a declara-

recommended that the plaintiff be ordered to convey title to the home to the defendant. Thereafter, the court rendered judgment for the administrator to recover compensatory damages in the amount of $11,500 and costs taxed at $167.80, but sustained the defendant's objection to the referee's recommendation that the plaintiff should be ordered to convey title to the home to the defendant on the ground that the defendant did not want such a conveyance even if it were required to pay compensatory damages.

The defendant claims that the trial court erred in concluding: (1) that the administrator of an estate is a "resident" as defined in General Statutes §§ 21-64 (5)[2] and 21-79; and (2) that § 21-79 is constitutional as applied to the facts of this case despite the contention that the statute authorizes an unjustified taking of property in violation of the fifth amendment to the United States constitution. We conclude that the administrator was a "resident" as defined in these statutes and that the constitutional challenge must fail in view of our recent decision in *Eamiello* v. *Liberty Mobile Home Sales, Inc.*, 208 Conn. 620, 546 A.2d 805 (1988), which was argued on the same day as the case at bar. Accordingly, we find no error.

---

tory ruling from the department of consumer protection. The resident may attempt to correct defects identified by the owner and may again request the owner's approval of the home's condition for resale. If the resident again disputes the owner's response, he may once again seek a declaratory ruling from the department. An owner's statement of approval shall remain in force for not more than six months. No owner shall exact a commission or fee with respect to the price realized by the seller, unless he has acted as agent for the seller in a sale pursuant to a written contract, or charge a rent for the mobile manufactured home space or lot upon which the purchased mobile manufactured home is located greater than the prevailing rent for any other space or lot located in the park."

[2] General Statutes § 21-64 (5) provides: "DEFINITIONS. As used in this chapter . . .

"(5) 'Resident' means a person who owns, or rents and occupies, a mobile manufactured home in a mobile manufactured home park."

The referee in his report found the following facts, which were accepted by the court. On March 4, 1972, the plaintiff's decedent purchased a mobile home from the defendant for a price of $6411.30. The home was purchased on-site in a lot in Long Cove Mobile Home Park (park), which the defendant owned, in the town of Groton. Prior to her death, the plaintiff's decedent entered into an agreement with a prospective buyer to sell her home on-site for $11,500. The defendant approved the sale and stated that the prospective purchaser would be accepted as a tenant at the park. The sale was never consummated because the prospective buyer was unable to obtain financing. The plaintiff's decedent died on September 25, 1984. At the time of her death, she resided in her home at the park. Her administrator informed the defendant of his intention to sell the home on-site, and requested its permission to do so, but it refused his request. The administrator continued to pay rent to the defendant, who accepted payment, until it removed the home from the park in January, 1985.

I

The defendant claims that the trial court erred in determining that the administrator of an estate can qualify as a "resident" under §§ 21-64 (5) and 21-79. The referee in his report determined that "[a]fter the death of the [plaintiff's decedent], the [administrator] became the owner of the mobile home and paid rent to the Defendant, which was accepted." The court accepted this determination.

We conclude that the administrator of an estate may qualify as a "resident" of a mobile home park under these statutes. Section 21-79[3] prohibits the owner of a mobile home park from restricting a "resident's" right to sell a mobile home on-site, except for statutorily

---

[3] See footnote 1, supra.

specified reasons. Section 21-64 (5) defines "resident" for the purposes of § 21-79 as follows: " 'Resident' means a person who owns, or rents and occupies, a mobile manufactured home in a mobile manufactured home park." Section 21-64 (5) imposes no residency requirement upon the owner of a mobile home located in a mobile home park to qualify as a park resident.

In *Eamiello* v. *Liberty Mobile Home Sales, Inc.*, supra, 628–29, the plaintiffs, owners of a mobile home, had moved out of their home before they attempted to sell it and this court concluded that they were entitled to compensatory damages under § 21-79 because the mobile home park owner had refused to permit an on-site sale of their home at a time when they no longer resided in it. The owner of a mobile home, such as the administrator of an estate, need not actually reside in the park to qualify as a resident under § 21-79. There is no logical basis under this statute for depriving the owner of a mobile home of the greater sales price that is usually obtained when it is sold on-site rather than off-site[4] merely because he resides outside of the park or is the administrator of an estate. It is undisputed that the home in this case in 1985 had a fair market value of $11,500 if it were sold on-site, but almost no value if it were sold off-site. We conclude that the administrator in this case was a "resident" of a mobile home as defined in these statutory provisions and, therefore, that the court did not err in so determining.

## II

The defendant claims that the trial court erred in determining that § 21-79 is constitutional, as applied

---

[4] In *Eamiello* v. *Liberty Mobile Home Sales, Inc.*, 208 Conn. 620, 646–50, 546 A.2d 805 (1988), this court discusses a number of factors that result in the value of a mobile home being considerably less if it is sold off-site rather than on-site in a mobile home park. The primary reason is the scarcity of mobile home sites, resulting largely from zoning ordinances that bar the establishment of new mobile home developments. Id., 649.

to the facts of this case. It contends that the statute constitutes an unjustified taking of property in violation of the fifth amendment to the United States constitution. The takings clause of the fifth amendment provides: "[N]or shall private property be taken for public use, without just compensation."

This case was argued on the same day as *Eamiello* v. *Liberty Mobile Home Sales, Inc.*, supra. The mobile home park owner in each case made virtually the same arguments in contending that § 21-79 violates the takings clause of the fifth amendment to the United States constitution. The defendant in this case did not contend that he could prevail even if this court should conclude that § 21-79 was constitutional as applied to the facts in *Eamiello*.

The primary contention of the defendant is that § 21-79 violates the takings clause in two ways. First, the entering into a lease by a park owner virtually grants to the tenant a leasehold in perpetuity so long as he pays rent and obeys reasonable regulations established by the park owner. Second, the tenant may resell his home on-site to a new tenant who gains the same perpetual leasehold rights, although the park owner enjoys limited authority under subsection (d) of the statute to reject a prospective buyer who is financially unqualified or intends to use the home for an improper purpose. In *Eamiello* v. *Liberty Mobile Home Sales, Inc.*, supra, 638–50, we rejected these same contentions and concluded that § 21-79 did not violate the takings clause. We need not repeat the analysis put forward in *Eamiello*. Id.

We conclude that for the purposes of the takings clause it makes no difference that the rights provided by § 21-79 benefit the estate of a decedent rather than a living person. The plaintiff administrator in this case enjoys the same rights under the statute as his dece-

dent during her life. Accordingly, we conclude that the court did not err in determining that § 21-79, as applied to the facts of this case, does not violate the takings clause of the fifth amendment to the United States constitution.

There is no error.