948 F.2d 575
 60 USLW 2321
 AZUL PACIFICO, INCORPORATED, a California corporation,
Plaintiff-Appellee,
v.
CITY OF LOS ANGELES, a municipal corporation, Defendant-Appellant.
AZUL PACIFICO, INCORPORATED, a California corporation,
Plaintiff-Appellant,
v.
CITY OF LOS ANGELES, a municipal corporation, Defendant-Appellee.
 Nos. 90-55853, 90-56066.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1991.
Submission Vacated Aug. 29, 1991.
Resubmitted Oct. 1, 1991.
Decided Nov. 1, 1991.
 
 Gwendolyn Ryder Poindexter, Deputy City Attorney, Los Angeles, Cal., for defendant-appellant.
 Sherman L. Stacey, Santa Monica, Cal., for plaintiff-appellee.
 David Pettit, Hedges, Powe & Caldwell, Los Angeles, Cal., for amici curiae, counties of Santa Barbara and Santa Cruz and cities Arroyo Grande, Carson, Cathedral City, Fremont, Lompoc, Morro Bay, Oceanside, San Jose, San Marcos and Santa Paula, Cal.
 Bruce E. Stanton, Crosby & Stanton, San Jose, Cal., for amicus curiae, Golden State Mobilehome Owners League, Inc.
 Timothy A. Bittle, Pacific Legal Foundation, Sacramento, Cal., for amicus curiae, Pacific Legal Foundation.
 Appeal from the United States District Court for the Central District of California.
 Before POOLE, KOZINSKI and LEAVY, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 In Hall v. City of Santa Barbara, 833 F.2d 1270 (9th Cir.1986), cert. denied, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), we held that a mobile home rent control ordinance could operate to give the tenants a possessory interest in the park owners' land, and thus effect a physical taking of the park owners' property. Hall was an appeal from the dismissal of the park owners' action; we held merely that a cause of action could be stated. Accord Pinewood Estates of Michigan v. Barnegat Township Leveling Bd., 898 F.2d 347, 353 (3d Cir.1990); see also Werner Z. Hirsch and Joel G. Hirsch, Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol, 35 UCLA L.Rev. 399, 456-63 (1988).
 
 
 2
 This is the first appeal to reach this court after a trial on the merits of the takings claim; what was only a theory in Hall was found as fact by the district court. We consider the city of Los Angeles's appeal from the district court's determination that a provision of its rent control ordinance violates the Fifth and Fourteenth Amendments' prohibition against taking of private property for public use without just compensation. Azul Pacifico, Inc. v. City of Los Angeles, 740 F.Supp. 772 (C.D.Cal.1990).
 
 Facts
 
 3
 Denizens of mobile home parks own their dwelling units, or "coaches," but rent the spaces, or "pads," on which the coaches are installed. The mobile homes themselves really aren't: Moving a coach is a substantial and expensive undertaking. Consequently, vacating tenants generally sell their units to the incoming residents. In California, a landlord may not terminate or refuse to renew a tenant's lease except for cause (Cal.Civ.Code §§ 798.55, 798.56); generally cannot require removal of a mobile home from the park upon vacancy (id at § 798.73); and must approve a purchaser if he has the ability to pay the rent and will not create a disturbance (id at § 798.74). Moreover, Azul Pacifico's mobile home park and others in Los Angeles are subject to the city's Rent Stabilization Ordinance (RSO), which regulates the rent they can charge. Los Angeles Municipal Code (LAMC) Ch. XV, Art. I. In 1982 the city added a provision prohibiting landlords from raising the rent on mobile home pads when the coaches were vacated. LA Ordinance 156,597. This provision was repealed in 1984, and a substitute provision was adopted allowing landlords to raise the rent to the highest rent charged for a comparable site in the same park or 10 percent, whichever is less. LA Ordinance 158,891, codified at LAMC § 151.06F. It is this "vacancy control" provision which Azul Pacifico claims worked a taking of its property without compensation by transferring an interest in its property to the tenants.
 
 
 4
 In Hall, we held that the park owners would be entitled to compensation under the takings clause if the tenants could transfer this property interest to others, the interest had a market value and it was in fact traded on a market. 833 F.2d at 1276. The district court, in a well-reasoned opinion, found each factor was met in this case. The value of the possessory interest transferred by operation of law from landlord to tenant is reflected in the "premium" the tenant receives upon sale of the coach--the amount by which the sale prices of coaches in rent-controlled parks exceed those in uncontrolled areas. One Mrs. Morrison, for example, testified that she bought a coach in Azul Pacifico's park for $77,000 and immediately sold it for $5000 and had it removed from the pad. When asked why, she responded: "The use of the land was what I paid for more than the place." Trial Exhibit 432 at 7. In fact, both the plaintiff's and the defendant's experts agreed that there was a substantial premium paid on coaches in rent-controlled parks--they just calculated the amount differently.
 
 Discussion
 
 5
 * The Supreme Court has established a two-pronged ripeness test for takings claims. First, the property owner must obtain a final administrative decision regarding the application of the ordinance to its property. Williamson County Regional Planning Comm. v. Hamilton Bank, 473 U.S. 172, 186-94, 105 S.Ct. 3108, 3116-20, 87 L.Ed.2d 126 (1985). Second, the property owner must avail itself of state judicial remedies in an effort to obtain "just compensation." Id at 194-97, 105 S.Ct. at 3120-22.
 
 
 6
 When the alleged taking occurs as a result of a physical occupation of the property, the landowner need not exhaust administrative remedies before suing in federal court: "Where there has been a physical invasion, the taking occurs at once, and nothing the city can do or say after that point will change that fact." Hall, 833 F.2d at 1282 n. 28. Because a physical invasion is itself a final governmental action, the first Williamson ripeness requirement is always satisfied in such cases. See Sinaloa Lake Owners Assoc. v. City of Simi Valley, 882 F.2d 1398, 1402 (9th Cir 1989), cert. denied, --- U.S. ----, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990).
 
 
 7
 Furthermore, the California state courts have repeatedly held Hall-type takings claims to be non-compensable. See, for example, Casella v. City of Morgan Hill, 230 Cal.App.3d 43, 280 Cal.Rptr. 876 (1991), review denied, 1991 WL 73987, 1991 Cal.Lexis 3294 (July 17, 1991); Yee v. City of Escondido, 224 Cal.App.3d 1349, 274 Cal.Rptr. 551 (1990), review denied, 1990 WL 165782, 1991 Cal.Lexis 353 (Jan. 24, 1991), cert granted, --- U.S. ----, 112 S.Ct. 294, 116 L.Ed.2d 239 (1991). We have held that the futility of a state court action satisfies the second Williamson ripeness requirement: Property owners in this type of case can file immediately in federal court. Sierra Lake Reserve v. City of Rocklin, 938 F.2d 951, 954-55 (9th Cir.1991).[1] Azul Pacifico's claim was ripe, and the district court did not err in asserting jurisdiction over the case.
 
 II
 
 8
 Hall recognized a three-part test for takings claims based on mobile home rent controls: First, does the governmental action constitute a taking? Second, does the action advance a legitimate governmental interest? And third, has just compensation been paid? Compensation must be provided when the first question is answered in the affirmative and either of the next two in the negative. 833 F.2d at 1274-75. We address each in turn.
 
 
 9
 A. There is a fundamental distinction in takings jurisprudence between regulatory takings and takings effected by physical occupation. Compare Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (regulatory), with Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (physical occupation). The regulatory analysis requires courts to engage in "essentially ad hoc, factual inquiries." Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). Governmental regulation will not be held to take private property unless, in Justice Holmes's words, it "goes too far." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). In contrast, Justice Marshall reminded us, "[w]hen faced with a constitutional challenge to a permanent physical occupation of real property, [the Supreme] Court has invariably found a taking." Loretto, 458 U.S. at 427, 102 S.Ct. at 3171 (emphasis added). In Hall we held that the challenged ordinance could be found to transfer a possessory interest in land to the mobile home tenants, and thus constituted a physical occupation analyzed under the per se approach. 833 F.2d at 1275-80; see also Pinewood Estates, 898 F.2d at 353.
 
 
 10
 Since Hall, the Supreme Court has decided Pennell v. City of San Jose, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), and FCC v. Florida Power Corp., 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). The city and some amici argue that these decisions undermine the rationale of Hall, but they are mistaken. In both cases the Court employed regulatory takings analysis, holding that the challenged regulations were legitimate exercises of the police power. And in both cases the Court was careful to distinguish the physical occupation cases.
 
 
 11
 In Pennell, apartment building owners challenged a rent control ordinance which allowed rents to rise up to 8 percent every year, with a provision for administrative review of requests for greater increases. The hearing officer was charged with taking into account several factors, including "hardship to a tenant"; the owners alleged that this provision "accomplishes a transfer of the landlord's property to individual hardship tenants." 485 U.S. at 9, 108 S.Ct. at 856. The Court, however, refused to address the issue: Because the hearing officer had never actually reduced a rent based on the hardship provision, the case did not "present a sufficiently concrete factual setting for the adjudication of the takings claim." Id at 10, 108 S.Ct. at 857. Unremarkably, the Pennell Court declined "to reconsider the constitutionality of rent control per se," id at 12 n. 6, 108 S.Ct. at 858 n. 6; it also did not address the contention that the challenged provision effected a physical taking of the owners' property. Id at 11 n. 5, 108 S.Ct. at 857 n. 5. Pennell therefore has no bearing on the issue presented here--whether the challenged ordinance operates as a taking of mobile home park owners' property through physical occupation.
 
 
 12
 The regulation challenged in Florida Power controlled the rents utilities could charge for attaching cable to utility poles. The utility company relied on Loretto, which had held that a city ordinance authorizing a company to attach television cable equipment to private buildings effected a taking. The Supreme Court distinguished Loretto on the ground that the utilities were not required to grant cable companies space on the poles and therefore there was no physical occupation. 480 U.S. at 251, 107 S.Ct. at 1111. "This element of required acquiescence is at the heart of the concept of occupation." Id at 252, 107 S.Ct. at 1112.
 
 
 13
 The city argues that our case is just like Florida Power because the mobile home tenants and park owners enter into lease agreements voluntarily. But the Court in Florida Power stated: "We do not decide today what the application of [Loretto ] would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements." Id at 251-52 n. 6, 107 S.Ct. at 1111-12 n. 6 (emphasis added). This is the situation here, where the RSO, read in conjunction with California's Mobilehome Residency Law, has precisely that effect.[2]
 
 
 14
 An examination of the three factors the Supreme Court highlighted in Florida Power supports this conclusion. First, Azul Pacifico is required to enter into agreements: When a tenant vacates and sells a coach, the park owner must rent the pad on which it sits to the purchaser. Cal.Civ.Code § 798.74. Second, the park owner must renew pad rental agreements. Id at §§ 798.55, 798.56. Finally, the park owner must refrain from terminating such agreements except in sharply circumscribed circumstances. Id.
 
 
 15
 Standing alone, these requirements of state law may well be constitutional. See, for example, Eamiello v. Liberty Mobile Home Sales, 208 Conn. 620, 546 A.2d 805 (1988), appeal dismissed, 489 U.S. 1002, 109 S.Ct. 1104, 103 L.Ed.2d 169 (1989).[3] But the district court found that the rent and vacancy control provisions of the city's ordinance in conjunction with the background state law rules operated to transfer Azul Pacifico's property to its tenants, thus violating the takings clause. 740 F.Supp. at 775-76; see also Pinewood Estates, 898 F.2d at 348-49 (considering interaction of state and local laws nearly identical to this case).
 
 
 16
 In Hall, we held that the park owners would have a constitutional right to compensation for the taking of their property if they could prove
 
 
 17
 that the [challenged ordinance] has transferred a possessory interest in their land to each of their [ ] tenants; that this interest consists of the right to occupy the property in perpetuity while paying only a fraction of what it is worth in rent; and that this interest is transferable, has an established market and a market value.
 
 
 18
 833 F.2d at 1276. After careful review of all the evidence, the district court in this case found that each of these elements was satisfied. We review its findings for clear error and find none.[4]
 
 
 19
 Mobile home park owners effectively can't evict tenants, and they cannot charge market rent. See Cal.Civ.Code §§ 798.55, 798.56 (severely restricting landlords' ability to evict or refuse to renew tenants' leases); LAMC § 151.04 (prohibiting landlords from charging more than the controlled rent). The right to occupy the pad indefinitely while paying below-market rent is thus established by law. The district court's finding that this element of the Hall test is met is amply supported by the record. See 774 F.Supp. at 775-77.
 
 
 20
 The district court also found that the RSO's vacancy control provision operated to transfer a property right from the park owner to the tenants. It further found that this interest was transferable, had a market value and was in fact traded on a market. Id. These findings are all supported by the record.
 
 
 21
 A tenant who sells his coach is able to command a premium for it; the premium represents the right to occupy the pad on which it sits at below-market rates. As the district court found, "it is the fact that rents cannot be raised more than ten percent when a tenant sells his mobile home and the buyer remains on the same pad that works the unconstitutional taking under Hall, not the state law requiring the landlord to renew a tenancy upon expiration of the original lease." Id at 776; see also Pinewood Estates, 898 F.2d at 349, 352-53 (stressing importance of vacancy control in takings analysis). The tenant is given an interest in the land; this interest is worth the capitalized value of the difference between market rent and the controlled rent. See Hirsch & Hirsch, 35 UCLA L.Rev. at 447-48. The vacancy-control premium represents the value of the park owner's property transferred by the RSO to the owners of the coaches. See Hall, 833 F.2d at 1276-77. The court relied on expert testimony that coaches in rentcontrolled parks sold for considerably more than in parks where market rents prevailed, even after accounting for other variables such as location and amenities. Azul Pacifico's expert calculated the premium at $20,880; the city's at $5,000. The district court, as it was free to do, chose to accept the higher figure.
 
 
 22
 This vacancy-control premium establishes the value of the property right transferred by the RSO from landlord to tenant. The city tries to avoid this conclusion by arguing that mobile home consumers were not able to assign a value to the property right transferred to tenants by the RSO. The district court properly dismissed this argument: "[T]he buyer's lack of knowledge of economics does not mean that the market does not exist, it merely shifts the knowledge about the value of the property right from the buyers to the brokers, who act as agents of the buyers." 740 F.Supp. at 777. The premium itself, the existence of which the district court found as a matter of fact, establishes that selling tenants can monetize the property right assigned to them by the RSO. The market for mobile homes is coextensive with the market for this interest; the price of the transferred property right can be disaggregated by looking--as the district court did--at coach prices in similar parks not subject to vacancy control.
 
 
 23
 Because the district court's findings as to the factual predicates are not clearly erroneous, we agree with its conclusion that there was a taking of Azul Pacifico's property. See Hall, 833 F.2d at 1277-78; Pinewood Estates, 898 F.2d at 353.
 
 
 24
 B. We next consider whether the governmental action furthers a legitimate interest. Hall, 833 F.2d at 1274, 1280-81.
 
 
 25
 The city characterizes the California mobile home market as a "monopoly," and argues that the RSO is an acceptable correction of "market failure." But the city argues from a false premise. There are almost 400,000 mobile home spaces in the state, as well as millions of houses, apartments and other dwellings; the various modes of housing are, with various elasticities, fungible. It is inconceivable that in such a market any person or group could artificially reduce the supply of housing and thus increase its price--the conventional definition of a monopoly.
 
 
 26
 In fact, the California housing market is not an example of "market failure" at all; it reflects the operation of normal market forces. According to the law of supply and demand, the market price of a product will rise as consumers want more of it, unless the supply increases commensurately. If the price of housing in Los Angeles is high, this is simply the free market's mechanism for ensuring efficient allocation of existing housing resources and creating incentives for an increase in the supply of housing which, eventually, will drive down the price.
 
 
 27
 The city argues that, while we wait for the invisible hand to do its work, unscrupulous park owners will take advantage of tenants, many of whom are elderly and on fixed incomes. We have previously recognized in the substantive due process context that this is a valid basis for governmental regulation of the landlord-tenant relationship. Sierra Lake, 938 F.2d at 958. But the Supreme Court has held that the relationship between the means and the ends must be closer for purposes of takings clause analysis. Nollan v. California Coastal Commission, 483 U.S. 825, 834-35 & n. 3, 107 S.Ct. 3141, 3147-48 & n. 3, 97 L.Ed.2d 677 (1987).
 
 
 28
 In Nollan, the Court considered a state zoning commission requirement that seaside landowners grant a public beach easement as a condition for obtaining a building permit. The Court agreed with the state that, if the regulation itself were a valid exercise of the police power, conditioning the permit on the grant of the easement would also be constitutionally permissible. It held, however, that the result would be different "if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition." Id at 837, 107 S.Ct. at 3148. The Nollan Court found an insufficient nexus between the state's asserted interest and the restriction, and thus held that the state had effected a taking for which compensation was due. Id.
 
 
 29
 We interpret Nollan as holding that in cases brought under the takings clause we must undertake a close analysis of the means of protecting the asserted governmental interest. Here, the city aims to "safeguard tenants from excessive rent increases," and the "concomitant hardships and displacements." LAMC § 151.01. Apparently this is accomplished by rent control, which prevents landlords from arbitrarily raising rents to a level existing tenants cannot afford. The vacancy control is apparently intended to prevent the landlord from raising the rent between tenants. See 740 F.Supp. at 780.
 
 
 30
 But vacancy control does not help incoming tenants in the case of mobile homes. The coach buyer will pay the same effective rent for the pad whether or not the landlord is permitted to raise the rent at vacancy. To the potential buyer, the total product--housing--is the relevant cost; how that cost is allocated between rent for the pad and mortgage payments on the coach is largely irrelevant. For example, a buyer who can afford to spend $1000 each month on housing is indifferent between a coach with a $500 mortgage payment on a $500 pad, and one with an $800 payment on a $200 pad.[5] The record here establishes that the buyer considering a coach in a rent-controlled park will be required to pay much more for it than if he bought the coach in a non-rent-controlled park. 740 F.Supp. at 776; see also Hirsch & Hirsch, 35 UCLA L.Rev. at 432 & Table III. The amount more will equal the capitalized monthly savings in rent, adjusted to account for the time value of money. Thus the vacancy-control premium that represents the property right transferred from landlord to tenant is equal to the present value of the difference between the controlled rent and the market rent. The vacancy control ordinance does nothing to protect mobile home buyers from the rigors of the marketplace. Instead it transfers the value of rent-controlled space--$20,880 per pad--from the mobile park landlord to the tenant. We are unable to see how this transfer of wealth from one group of citizens to another can serve any rational governmental purpose.
 
 
 31
 Nevertheless, the ordinance does protect existing tenants from being forced to sell their coaches at distress-sale prices in the event landlords were to set rents for new tenants so high that no one would want to buy the coach. See 740 F.Supp. at 780 ("Based on testimony from mobile home tenants, the City found that, without vacancy control, it would be virtually impossible for tenants to sell their homes on the pad because landlords could raise the rent to a level that prospective buyers could not afford."). The correctness of the city's decision to insure coach owners against unscrupulous landlords in this way is a legislative question, not a judicial one. "[The Supreme] Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular." Loretto, 458 U.S. at 440, 102 S.Ct. at 3178. Because the vacancy control provision serves the same governmental purpose--protecting incumbent tenants--as the RSO, we cannot say that it is unconstitutional. Unlike the city's other rationales, this one falls within the traditional police power and thus there is a sufficient nexus between the challenged provision and a legitimate justification. See Nollan, 483 U.S. at 837, 107 S.Ct. at 3148.
 
 
 32
 C. The third question Hall directs us to answer is whether just compensation has been paid. Just compensation requires payment of the full monetary equivalent of the property taken. United States v. Reynolds, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). The rent Azul Pacifico receives from its tenants only covers the use of the land during the rental period; it has received no compensation for the property right transferred by operation of the RSO. It is the absence of such compensation that puts the regulation here in conflict with the Fifth and Fourteenth Amendments. Hall, 833 F.2d at 1281; see Hirsch & Hirsch, 35 UCLA L.Rev. at 459-60.
 
 III
 
 33
 Because we affirm the district court's carefully reasoned conclusion that the Los Angeles ordinance operates to take Azul Pacifico's property without just compensation, we must determine what amount of compensation is constitutionally required.
 
 
 34
 A. The property right taken by the city's vacancy control ordinance is the right to occupy indefinitely the space in the mobile home park at below-market rent. Thus, the government action is a permanent physical taking for which Azul Pacifico must receive the full monetary equivalent as compensation. Loretto, 458 U.S. at 441, 102 S.Ct. at 3179.[6] In takings cases, "the question is what has the owner lost, not what has the taker gained." Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910). The owner's loss is usually measured by the extent to which the taking deprived him of an interest in his property. United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). Compensation for a physical taking is measured by the value of the property right at the time of the taking. Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 5, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984).
 
 
 35
 The district court held that a taking occurred each time a coach was sold, as each sale resulted in the transfer of an economic premium from park owner to tenant. The district court found 48 coach sales during the one-year period prior to the filing of the complaint and, based on its finding that the average premium was $20,880, awarded Azul Pacifico $1,002,240.[7]
 
 
 36
 The district court's approach reflects a misunderstanding of the theory of compensation applicable in cases such as these. The taking here occurred when the Los Angeles vacancy control ordinance was passed, not at the time of sale of the coaches. United States v. Dow, 357 U.S. 17, 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958); De Anza, 936 F.2d at 1085. The ordinance assigned to all of the tenants then on the property the right to capture the full discounted value of occupying indefinitely Azul Pacifico's property at below-market rent. Because the ordinance transferred a marketable right to every mobile home owner in Azul Pacifico's park at the time it went into effect--whether or not a coach is ever sold--subsequent coach sales by tenants are irrelevant to the question of how much was taken from the landlord.[8]
 
 
 37
 The property right need not be monetized to effect a taking; all that's necessary under Hall is that the tenant be given an interest that is capable of being turned into cash. Hall, 833 F.2d at 1276; cf. Nollan, 483 U.S. at 832, 107 S.Ct. at 3146 (the continuing possibility of exercising an easement across plaintiff's land constitutes a permanent taking). In Hall the plaintiffs could claim compensation for the transfer of the property right to "each of their 71 tenants," regardless of whether the interest was actually sold. 833 F.2d at 1276. Similarly, in Loretto, the taking occurred when the owner was stripped of her right to use the space reserved for cable boxes, regardless of whether the cables were ever installed. 458 U.S. at 436, 102 S.Ct. at 3176. Compensation becomes due all at once, or not at all. The district court here found compensation was due; it must be paid for every occupied mobile home space covered by the RSO at the time of the vacancy control provision's passage in May 1982.
 
 
 38
 B. The district court calculated damages by measuring the difference between the selling prices of coaches in vacancy-controlled parks and similar coaches in non-vacancy-controlled parks, and arrived at a value of $20,880.00 per coach sold.[9] This represents the average premium charged on the sale of coaches in Azul Pacifico's park during the year preceding the bringing of this action.
 
 
 39
 The district court got it exactly right in using the premium created by the ordinance for the sale of coaches in Azul Pacifico's park as a measure of the value of the property right transferred from the park owner to the coach owners at the time of the taking. The premium charged for the sale of an on-site coach subject to rent control represents the tenant's right to occupy the mobile home pad at below-market rates for the expected duration of the ordinance. Thus, the premium equals the capitalized value of both the use value (foregone rents) and the possessory interest (the right to exclude). Cf. United States v. Petty Motor Co., 327 U.S. 372, 378, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946) (noting that use and possession can be two separate property rights). The price of the premium reflects the value the tenant gains from the right to occupy the space and the period of time he can expect to possess this right.
 
 
 40
 Although we approve the district court's methodology in determining the level of compensation, we disagree with the period it chose as a benchmark. The taking occurred when the Los Angles vacancy control ordinance went into effect in May 1982; compensation must be calculated from that date. De Anza, 936 F.2d at 1085. The district court instead looked to the period May 1986 to April 1987--the one year preceding the bringing of the lawsuit.
 
 
 41
 The premiums charged on coach sales in 1986-87 certainly could reflect the value of the property right transferred when the ordinance took effect. But these premiums might have to be adjusted to reflect the situation in 1982, insofar as the market may have been different then than it was five years later. See Kirby Forest Industries, 467 U.S. at 17-18, 104 S.Ct. at 2197-2198 (noting that markets fluctuate unevenly over time). We therefore remand to the district court to calculate the compensation due for a permanent taking by multiplying the number of coaches in the park when the ordinance became effective by the value of the vacancy-control premium created at that time.
 
 IV
 
 42
 A. In Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court held that federal courts are to apply state personal injury statutes of limitations for claims brought under 42 U.S.C. § 1983. In California, that period is one year. Cal.Code Civ.Pro. § 340. Because we had earlier applied a three-year limitations period to section 1983 claims (see Smith v. Cremins, 308 F.2d 187, 189-90 (9th Cir.1962)), we limit the filing of actions which predate Wilson to "either three years from the time the cause of action arises or one year from Wilson, depending on which period expires first." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987).
 
 
 43
 The limitations period for takings claims brought under section 1983 begins to run the date the challenged ordinance is enacted. De Anza, 936 F.2d at 1085. The original vacancy control provision was enacted in May 1982; Wilson was decided in April 1985. Under Usher, therefore, Azul Pacifico had at the latest until May 1985 to file a section 1983 claim;[10] it did not file, however, until April 1987. Its section 1983 claim is therefore barred by the statute of limitations.
 
 
 44
 B. Azul Pacifico also stated a claim directly under the takings clause of the Constitution.[11] The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."[12] Azul Pacifico claims that the Los Angeles RSO operates to take its property for public use, and this suit is to recover compensation for that taking. In such cases, the Supreme Court has long held that "[t]he Constitution has declared that just compensation shall be paid." Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893). The Fifth Amendment is self-executing. Kirby Forest Industries, 467 U.S. at 5 & n. 6, 104 S.Ct. at 2191 & n. 6; United States v. Clarke, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980). When the government takes private property, it must pay just compensation to the owner. Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 27, 78 L.Ed. 142 (1933). If the government fails to do so, the property owner may bring suit under the takings clause to compel payment. Id; Causby, 328 U.S. at 261-62, 267. This is equally true of an action against a state subdivision. See Cassettari v. County of Nevada, 824 F.2d 735, 737-38 (9th Cir.1987); Ocean Acres L.P. v. Dare County Bd. of Health, 514 F.Supp. 1117, 1120 (E.D.N.C.1981), affirmed, 707 F.2d 103 (4th Cir.1983). The Constitution itself provides both the cause of action and the remedy. Jacobs, 290 U.S. at 16, 54 S.Ct. at 27; San Diego Gas & Electric Co. v. City of San Diego, 450 U.S. 621, 654-55, 101 S.Ct. 1287, 1305-06, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting); see also Dickinson, 331 U.S. at 748, 67 S.Ct. at 1384.[13]
 
 
 45
 If there was any doubt on this score it was removed by the Supreme Court in First English. Rejecting the Solicitor General's argument that "the [Fifth] Amendment is ... not a remedial provision," the court stated:
 
 
 46
 The cases cited in the text, we think, refute the argument of the United States that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government." Though arising in various factual and jurisdictional settings, these cases make clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking.
 
 
 47
 482 U.S. at 316 n. 9, 107 S.Ct. at 2386 n. 9 (citations omitted); see also id at 316, 107 S.Ct. at 2386 ("in the event of a taking, the compensation remedy is required by the Constitution").
 
 
 48
 Although the Constitution gives Azul Pacifico a right of action, it does not provide a statute of limitations. In such situations, federal courts generally adopt the analogous state statute of limitations. See Wilson, 471 U.S. at 266-67 & n. 12, 105 S.Ct. at 1941-42 & n. 12; Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 704, 86 S.Ct. 1107, 1112, 16 L.Ed.2d 192 (1966) ("Since [1895], state statutes have repeatedly supplied the periods of limitations for federal causes of action when federal legislation has been silent on the question.").[14] Azul Pacifico's claim is for "inverse condemnation," which is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." Clarke, 445 U.S. at 257, 100 S.Ct. at 1130.[15] Azul Pacifico alleges just that: The city has taken its property through the RSO, but has not condemned it. In California, the statute of limitations for inverse condemnation proceedings is five years. Cal.Code Civ.Pro. § 322 (five-year statute of limitations for adverse possession claims); Frustuck v. City of Fairfax, 212 Cal.App.2d 345, 374, 28 Cal.Rptr. 357 (1963) (adopting adverse possession limitations period for inverse condemnation actions).
 
 
 49
 Courts will not adopt state limitations periods if doing so would contravene the governing federal policy. See Wilson, 471 U.S. at 266-67, 105 S.Ct. at 1941-42. Because Azul Pacifico's claim is brought directly under the Constitution to secure rights guaranteed by the Fifth Amendment, varying state statutes of limitations may thwart the federal interest in uniform treatment of takings cases. Cf. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, --- U.S. ----, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (rejecting state-borrowing rule for Rule 10b-5 actions). The most analogous federal statute of limitations--the provision of the Tucker Act which applies to inverse condemnation claims against the United States--is six years. 28 U.S.C. § 2401.
 
 
 50
 Here, the challenged ordinance was enacted in May 1982 and the complaint was filed in April 1987--within both the six-year federal period and the five-year state period. Because the action was timely under either theory, we leave for another case the question of whether the state or federal limitations period applies.
 
 V
 
 51
 The district court awarded Azul Pacifico damages and enjoined enforcement of the ordinance. This was error. The Fifth Amendment by its terms provides for just compensation in the event of a taking. It does not, however, prohibit governmental taking--it only requires that when a taking does occur the government pay for it. See First English, 482 U.S. at 314, 107 S.Ct. at 2385. We need not consider whether district courts may enjoin governmental action to avoid a taking; here the vacancy control provision took plaintiff's property when enacted and the city must pay just compensation. No injunction is authorized by the Constitution in this case. Furthermore, the district court's approach overcompensates the plaintiff: The monetary award compensates Azul Pacifico for the permanent taking of its property, while the injunction effectively returns to it the very same property. We therefore vacate the district court's injunction.VI
 
 
 52
 Azul Pacifico appeals the district court's refusal to award expert witness fees under 42 U.S.C. § 1988, which allows recovery of attorneys' fees in section 1983 actions. Because the section 1983 action is barred by the statute of limitations, Azul Pacifico has no right to recover experts' fees under section 1988. For the same reason, the district court's award of attorneys' fees to Azul Pacifico pursuant to section 1988 is reversed.
 
 Conclusion
 
 53
 The right of the tenant to transfer the property right created by the vacancy control provision distinguishes the physical occupations in this case and in Hall from rent control regulations that do not effect a taking. Unlike other types of rent control, mobile home vacancy control permits the outgoing tenant to preserve the benefits of rent control even after he no longer is renting. Hall, 833 F.2d at 1279. It is this ability of the tenants to monetize their rights that transforms the state's traditional power to regulate landlord-tenant relationships through rent control into a physical taking requiring compensation under the Fifth Amendment.
 
 
 54
 The city may choose to create such a windfall for current coach owners. If it does so, however, it must spread the burden on all its citizens, not target one small class of individuals to foot the bill. See Nollan, 483 U.S. at 841, 107 S.Ct. at 3150. "It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " First English, 482 U.S. at 318-19, 107 S.Ct. at 2388 (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). The district court properly found that the RSO took Azul Pacifico's property; we remand for a redetermination of damages. We vacate the district court's injunction, however, as a remedy in conflict with the compensation award.
 
 
 55
 AFFIRMED in part, REVERSED in part, VACATED in part and REMANDED for further proceedings consistent with this opinion. The panel will retain jurisdiction over any future proceedings. Each party shall bear its own costs on appeal.
 
 
 
 [1]
 In First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 314-22, 107 S.Ct. 2378, 2385-89, 96 L.Ed.2d 250 (1987), the Supreme Court disapproved the California state courts' refusal to provide compensation for temporary regulatory takings. We have held that "futility" will not serve to excuse such claims after the date of the First English decision. Jama Construction v. City of Los Angeles, 938 F.2d 1045, 1047-48 & n. 2 (9th Cir.1991). This case, however, involves a physical rather than a regulatory taking; the California courts have consistently rejected takings claims based upon this theory. See Sierra Lake, 938 F.2d at 955
 
 
 [2]
 In Hall, the ordinance actually required the granting of a lease. 833 F.2d at 1273. This is a distinction without a difference. We noted in Hall that "certain features of the Santa Barbara ordinance" made it "peculiarly susceptible" to a claim for a taking by physical occupation. Id at 1276. All of those "features" are present in the Los Angeles RSO with the exception of the indefinite lease requirement; as discussed in the text, the practical effect is identical. Cf. Pinewood Estates, 898 F.2d at 349 (no requirement that landlords grant leases)
 
 
 [3]
 The city argues that Eamiello and another Connecticut case, Thompson v. Merlino Enterprises, Inc., 208 Conn. 656, 545 A.2d 1094, appeal dismissed, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989), support its position. But neither of these cases involved rent controls: The issue in both cases was whether requiring park owners to permit coaches to remain onsite after sale in itself violated the takings clause. Thus the Supreme Court's dismissal of the appeals for want of a substantial federal question has little bearing on the continuing viability of Hall, which relied in its takings analysis on the convergence of the rent control ordinance and the removal statute
 
 
 [4]
 The city mistakenly argues that the district court's determinations as to the Hall factors are questions of law reviewable de novo. Although the answer to the ultimate question--was there a taking?--requires a legal conclusion, the predicates are factual determinations. So, for example, in United States v. Causby, 328 U.S. 256, 259, 266-67, 66 S.Ct. 1062, 1064, 1068-69, 90 L.Ed. 1206 (1946), the Supreme Court accepted the Court of Claims's factual conclusion that the existence of government airplanes in the airspace immediately above Causby's property destroyed its value, while reserving for itself the legal conclusion of whether the takings clause required compensation
 
 
 [5]
 Income tax laws affect the figures slightly, but do not alter the analysis
 
 
 [6]
 The possibility that the statute might later be repealed does not convert the physical occupation into a temporary taking. See Hall, 833 F.2d at 1277 ("A governmental taking can always be undone if the government so chooses. That has never defeated a taking claim."). But until the government takes permanent possession and agrees to pay compensation, it may discontinue its efforts. See First English, 482 U.S. at 317, 107 S.Ct. at 2387 ("The Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations."). Although First English involved a regulatory taking, its rationale applies equally to physical occupation cases; indeed, its holding was derived by analogy from previous physical occupation cases. See id at 318, 107 S.Ct. at 2387. Should the city repeal the RSO before the judgment becomes final in this case, the district court would be required to calculate compensation to reflect a temporary rather than a permanent taking
 
 
 [7]
 The district court treated Azul Pacifico's claim as arising under section 1983, for which the applicable statute of limitations is one year. See Section IV.A. The district court relied on the continuing wrong theory, reasoning that Azul Pacifico was injured each time a coach in its park was sold. See United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). "Under the continuing wrong theory, although the statute of limitations is tolled as to the cause of action, damages are limited by the state statute of limitations." 740 F.Supp. at 779 (citing Jackson v. City of Charlottesville, 659 F.Supp. 470, 475 (W.D.Va.1987)). We have since rejected the continuing wrong theory for Hall-type takings cases. De Anza Properties X, Ltd. v. County of Santa Cruz, 936 F.2d 1084, 1087 (9th Cir.1991). Because the taking occurred when the ordinance was passed, see id, the statute of limitations affects only the time for bringing the action, not the amount of compensation
 
 
 [8]
 The number of coaches sold might be relevant to ensure a sufficiently large sample size for the per-coach premium to accurately measure the value of the underlying property right, but there would be a taking even if, for some reason, no coaches were sold following passage of the ordinance
 
 
 [9]
 The city argues that the proper measure is the reduction in the market value of the mobile home park as a whole. The district court was entitled, however, to determine the market value of the park by aggregating the market values of all of the pads; the two figures are equivalent. Amici for the city criticize the district court's techniques for figuring the amount of the premium transferred, largely because its measurements were based on the much-maligned Kelly Blue Book for mobile home prices. We have previously approved of the use of the Kelly Blue Book as a measure of mobile home values for purposes of determining the premium charged on sale, however. Hall, 833 F.2d at 1274 n. 5. We see no basis for holding that the district court was not entitled to rely on the Kelly Blue Book in making its findings
 
 
 [10]
 The ordinance was amended in June 1984, but the taking occurred when the property right was transferred from landlord to tenant, which was at the first imposition of vacancy control. De Anza, 936 F.2d at 1086-87
 
 
 [11]
 In its complaint, Azul Pacifico alleged that enforcement of the RSO "constitutes a taking of property ... in violation of the Fifth and Fourteenth Amendments to the United States Constitution and a deprivation of civil rights [under section 1983]" (emphasis added)
 
 
 [12]
 The takings clause is made applicable to the states through the Fourteenth Amendment. Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 235-41, 17 S.Ct. 581, 584-86, 41 L.Ed. 979 (1897)
 
 
 [13]
 Federal courts have jurisdiction because the claim is founded upon the Constitution. Jacobs, 290 U.S. at 16, 54 S.Ct. at 27; Causby, 328 U.S. at 267, 66 S.Ct. at 1068; 28 U.S.C. § 1331
 
 
 [14]
 The question of characterization--of what state remedy is most analogous--is one of federal law. Wilson, 471 U.S. at 268-71, 105 S.Ct. at 1942-44
 
 
 [15]
 The action is "inverse" because it is brought by the condemnee rather than the condemnor. Id